United States *v.* Pfaltz & Bauer (Inc.), et al. (No. 3115)

United States Court of Customs Appeals, November 19, 1928

*Charles D. Lawrence,* Assistant Attorney General (*Peter A. Abeles,* special attorney, of counsel), for the United States.

*Thomas J. Doherty* for appellees.

[Oral argument October 5, 1928, by Mr. Lawrence and Mr. Doherty]

Before Graham, Presiding Judge, and Bland and Hatfield, Associate Judges

Bland, Judge, delivered the opinion of the court:

Paragraphs 302 and 374 of the Tariff Act of 1922 are as follows:

Par. 302. Manganese ore or concentrates containing in excess of 30 per centum of metallic manganese, 1 cent per pound on the metallic manganese contained therein; molybdenum ore or concentrates, 35 cents per pound on the metallic molybdenum contained therein; tungsten ore or concentrates, 45 cents per pound on the metallic tungsten contained therein; ferromanganese containing more than 1 per centum of carbon, 1⅞ cents per pound on the metallic manganese

---

[1] T. D. 43091.

contained therein: *Providea*, That ferromanganese for the purposes of this Act shall be such iron manganese alloys as contain 30 per centum or more of manganese; manganese metal, manganese silicon, manganese boron, and ferromanganese and spiegeleisen containing not more than 1 per centum of carbon, $1\frac{1}{8}$ cents per pound on the manganese contained therein and 15 per centum ad valorem; ferromolybdenum, metallic molybdenum, molybdenum powder, calcium molybdate, and all other compounds and alloys of molybdenum, 50 cents per pound on the molybdenum contained therein and 15 per centum ad valorem; ferro-tungsten, metallic tungsten, tungsten powder, tungstic acid, and all other compounds of tungsten, 60 cents per pound on the tungsten contained therein and 25 per centum ad valorem; ferrochromium tungsten, chromium tungsten, chromium cobalt tungsten, tungsten nickel, and all other alloys of tungsten not specially provided for, 60 cents per pound on the tungsten contained therein and 25 per centum ad valorem; ferrosilicon, containing 8 per centum or more of silicon and less than 60 per centum, 2 cents per pound on the silicon contained therein; containing 60 per centum or more of silicon and less than 80 per centum, 3 cents per pound on the silicon contained therein; containing 80 per centum or more of silicon and less than 90 per centum, 4 cents per pound on the silicon contained therein; containing 90 per centum or more of silicon, and silicon metal, 8 cents per pound on the silicon contained therein; ferrochrome or ferrochromium containing 3 per centum or more of carbon, $3\frac{1}{2}$ cents per pound on the chromium contained therein; ferrochrome or ferrochromium containing less than 3 per centum of carbon, and chrome or chromium metal, 30 per centum ad valorem; ferro phosphorus, ferrotitanium, ferrovanadium, ferrouranium, ferrozirconium, zirconium ferrosilicon, ferroboron, titanium, zirconium, chromium nickel, vanadium nickel, zirconium nickel, chromium vanadium, chromium silicon, zirconium silicon, calcium silicide, *and all alloys used in the manufacture of steel not specially provided for, 25 per centum ad valorem;* cerium metal, $2 per pound; ferrocerium and all other cerium alloys, $2 per pound and 25 per centum ad valorem; ductile tantalum metal or ductile nonferrous alloys of tantalum metal, 40 per centum ad valorem. (Italics ours.)

PAR. 374. Aluminum, aluminum scrap, and alloys of any kind in which aluminum is the component material of chief value, in crude form, 5 cents per pound; in coils, plates, sheets, bars, rods, circles, disks, blanks, strips, rectangles, and squares, 9 cents per pound.

The issues in this case involve the proper classification of an importation known as *alsimin*, which is an alloy used exclusively in the manufacture of steel. It was classified under paragraph 374, under the provision for "alloys of any kind in which aluminum is the component material of chief value, in crude form, 5 cents per pound."

Before the United States Customs Court and here it is contended by the importers that the importation was incorrectly assessed under paragraph 374 and that it is dutiable, and should have been so classified by the collector, under the provision of paragraph 302 for "all alloys used in the manufacture of steel not specially provided for, 25 per cent ad valorem."

In support of their contention the importers argue: First, that paragraph 374 does not describe the merchandise, since it is not an alloy in which aluminum is the component material of chief value. They concede that it is an alloy and that aluminum constitutes the chief value in the article as imported, but urge that, under para-

graph 1460 as interpreted by the courts, aluminum is not "the component material of chief value," in so far as the alsimin is made from bauxite, carbon, and silicon, and not from aluminum, carbon, and silicon, and that under paragraph 1460 the component material of chief value must be ascertained at the time when the several component materials were put together for the purpose of forming the alloy. It is conceded that bauxite is known as aluminum ore and contains the materials from which aluminum metal is derived. It is argued that the processes by which alsimin is made do not and can not produce aluminum and that this fact prevents the commodity from being an alloy in which the component material of chief value is aluminum. It is further pointed out by the importers that aluminum alloys constitute a well-known and distinctive class of commodities, produced in certain ways, and that alsimin is not so known and is not so produced.

Second, that the provision of paragraph 302 for "alloys used in the manufacture of steel" is more specific than the provision in paragraph 374 for "alloys of any kind in which aluminum is the component material of chief value."

Third, that the practice anterior to the passage of the present Tariff Act was to classify alloys of this character under the provision for "alloys used in the manufacture of steel" instead of under a provision identical with paragraph 374.

The Government urges that, as imported, the alloy is crude, contains aluminum, and that the aluminum is the component material of chief value; that paragraph 1460, and the decisions of the various courts in construing the same, does not in any way prevent aluminum from being the component material of chief value; that paragraph 374 is more specific than the pertinent provision of paragraph 302, and that the context of the Tariff Act of 1913 and of the Tariff Act of 1922 and the history of the legislation indicate the intention of Congress to require classification of the alloy at bar under paragraph 374.

Much testimony by metallurgists and scientists was introduced in the court below as to the process of manufacturing the importation and other aluminum alloys. Many written authorities on the subject of aluminum and aluminum oxide are cited by the Government in its brief. Both parties to the case, however, are in substantial agreement as to the pertinent facts which we deem essential for the decision of the same. The testimony is probably conflicting as to matters which we regard as immaterial in the consideration of the issues. Indeed, a great portion of the highly scientific testimony on the highly technical, metallurgical, and chemical questions is more confusing than helpful since much of it has the effect of beclouding the real issue rather than illuminating it.

The court below in a very carefully written opinion aptly said:

We note that although the testimony on both sides is somewhat voluminous, there is really no conflict as to the basic facts on which the determination of the issue must rest, the disagreement between the parties being due rather to the varying inferences and deductions they respectively draw therefrom.

The United States Customs Court sustained the protest upon the theory, as we understand it, that alsimin is not an alloy in which aluminum is the component material of chief value, for the reason that it was not made of aluminum and other materials, but was made of the raw bauxite and other materials and that aluminum, as referred to in paragraph 374, means aluminum metal and that bauxite is a hydroid of aluminum and is not aluminum at all, and that the law requires that the ascertainment of the component material of chief value in the alsimin involves the taking of the value of the respective materials in their condition "as they came to the hand of the workman who put them together," and relies upon *Seeberger* v. *Hardy*, 150 U. S. 420, and *United States* v. *Meadows*, 2 Ct. Cust Appls. 143, T. D. 31665, and other cases.

While the opinion below discloses great familiarity with the subject at hand and is a clear-cut statement of the case as presented by the importer, we hold that the court has misconstrued and misapplied the provisions of paragraph 1460, and that, in its judgment requiring the classification of the merchandise under paragraph 302, it has not properly arrived at the intention of the legislative body.

Paragraph 1460 reads as follows:

PAR. 1460. * * *; and the words "component material of chief value," wherever used in this act, shall be held to mean that component material which shall exceed in value any other single component material of the article; and the value of each component material shall be determined by the ascertained value of such material in its condition as found in the article. * * *

This or an almost identical provision has been in several preceding Tariff Acts, and the courts, in a number of instances, have passed upon the meaning of and the application to be given to it. . See *United States* v. *Bernard, Judae & Co.*, 15 Ct. Cust. Appls. 172, T. D. 42231; *United States* v. *Meadows*, 2 Ct. Cust. Appls. 143; *United States* v. *Hoeninghaus & Curtiss*, 137 Fed. 478; *United States* v. *Johnson & Johnson*, 154 Fed. 39. See also *Field & Co.* v. *United States*, 7 Ct. Cust. Appls. 332.

In *United States* v. *Bernard, Judae & Co.*, *supra*, Judge Barber, in delivering the opinion of this court, and referring to several cases therein cited, announced the rule as follows: "The rule to be derived therefrom is that the value of the materials of which an article is composed shall be ascertained at the time when they are in such condition that nothing remains to be done to them except putting them together." This, we think, is the correct rule.

We can conceive of articles with several component materials to which paragraph 1460 would seem to have no application. This cause has been tried in the court below and here on the theory that, in determining the component material of chief value in the alsimin, it is proper to apply paragraph 1460. We will consider the issue as presented, although, in our view of the case, the same conclusion would be arrived at regardless of whether paragraph 1460 did or did not apply.

First, let us go more into detail as to the characteristics of the imported merchandise and the manner in which it is produced, and then apply the foregoing rule. The importation at bar comes from Switzerland. There is no dispute as to how it is manufactured. Into an electric furnace having an unusually high temperature—over 2,000° C.—there is thrown raw bauxite and carbon, in the form of coal or coke, and sometimes silica in the form of quartz, when there is not sufficient silica in the composition of the particular lot of raw bauxite used. The raw bauxite is aluminum ore, is in the form of a clay, and contains 27 per centum of aluminum. Most raw bauxite is mined in France and usually contains iron oxide, titanium oxide, silica, water, and other ingredients. Heat reduces the mixture to a flux, and out of this flux the metallic elements are separated and join at the bottom of the furnace. When the reduction is complete, the fused material is tapped out at the bottom of the furnace and allowed to flow into molds, where it cools. It is then broken into pieces or lumps and shipped, usually in bulk. It can not be machined, worked, or fashioned into articles, but is used as an alloy in the manufacture of steel, as an oxidizer to remove oxygen and other gases. The invoice shows that the aluminum content of the alloy imported is 46.19 per centum. Testimony further shows that aluminum alloys now are and heretofore have been manufactured in several different ways. Some of such alloys are not used for the same purpose for which this particular alloy is used. One of the processes of making an alloy of aluminum is to take the pure aluminum metal and insert it into the charge with the other necessary ingredients. This is the usual process for alloys of aluminum where a very high percentage of aluminum content is desired. The process by which the merchandise at bar was made, however, according to the record, was known and resorted to in the manufacture of alloy of aluminum prior to the passage of the Tariff Act of 1922.

Applying the rule heretofore announced in the ascertainment of the component material of chief value, we are squarely presented with the question: When the component materials of the alsimin went together to form the alloy, was aluminum in chief value? It is not disputed that the aluminum content or aluminum derivative in the bauxite was the component material of chief value in the

charge from which the importation was drawn. It is conceded that aluminum in metallic form, constituting 46.19 per centum of the importation was present when imported. When and how did it get there? It certainly was mixed or intermingled with silica and carbon at some time. In the charge, the aluminum, the carbon, and the silica must have come together, resulting in the commodity at bar. The aluminum was in the bauxite or aluminum ore. It was in chief value in the bauxite, it was in chief value in the charge, it was in chief value in the mold, and it was in chief value when imported.

Suppose a lead alloy was desired (and assuming there is such a thing) and high-grade lead ore was used instead of pure lead to get the lead content. It would seem to us to be a strange and anomalous conclusion to hold that the product was not an alloy of lead merely because the lead content was inserted in the form of the lead ore instead of pure lead. We hold, therefore, that when the component materials were assembled, that is, when the aluminum, silica, iron, carbon, and other ingredients came together, aluminum was in chief value. The assembling may be said to be, using the language of importers' witness, Dr. Von Bidder, the instant when, "out of this flux the metallic elements are separated which join at the bottom of the furnace."

The crux of this case rests upon the proposition that we are called upon to determine the component material of chief value of the article which came out of the furnace rather than the component material of chief value of the article which went into the furnace. The 46.19 per centum of aluminum "joined" the other ingredients in the bottom of the furnace. It is not disputed but that it was aluminum. This being the condition of the goods when imported, we arrive at the conclusion that it is an alloy of which aluminum is the component material of chief value, in crude form, and is so dutiable unless more specifically provided for elsewhere or unless Congress has otherwise indicated that it should not be so classified.

We think the provision for "alloys of any kind in which aluminum is the component material of chief value, in crude form," more aptly provides for the merchandise than "all alloys used in the manufacture of steel, *not specially provided for*," notwithstanding the application of the doctrine of use and giving it its full force and effect. It will be noted that in the latter provision are the words "not specially provided for." An alloy of which aluminum is the component material of chief value in crude form is specially provided for in paragraph 374 and the force of the doctrine of use can not overcome the clear indication of Congress to specially provide for aluminum alloys in paragraph 374.

In *Comstock & Theakston* v. *United States*, 12 Ct. Cust. Appls. 502, T. D. 40698, the provision for "all compounds and mixtures

containing titanium" in paragraph 91, Tariff Act of 1922, and the provision in paragraph 68 for "pigments * * * not specially provided for" were in competition. The doctrine of use was urged as a compelling reason why the imported merchandise, which was titanium oxide in physical combination with barium sulphate, should be classified as a pigment because "pigments" connoted use. In the opinion of this court the pigment paragraph was held to be a "catchall" paragraph and the court concluded that if the doctrine of use was given full force in considering the classification of pigments it could not overcome the manifest intention of Congress as otherwise shown. The court said:

We are not unmindful of the full meaning and import given by the courts to the doctrine of favoring classification by use. Of course the doctrine of use is applied in an attempt to determine the intention of Congress. In the case at hand, the intention of Congress is so manifest from the construction of the two paragraphs as to overcome any advantage that the paragraph might have under the doctrine of use.

Let us examine the two *Drakenfield, supra,* cases. In the latter case, 9 Ct. Cust. Appls. 124, T. D. 37979, the court stated that it was concluded by the opinion in the former case. In the former case, 2 Ct. Cust. Appls. 512, T. D. 32248, the importers contended that the importation was dutiable at 25 per centum ad valorem as a chemical compound or salt not specially provided for. The collector classified it under paragraph 58 at 30 per centum as a pigment.

The court held that the importation might aptly be described under each paragraph; that pigment designated use and that "chemical compound or salt not specially provided for" did not denote use. It should be noted here that the words, "not specially provided for" are in the paragraph which provides for chemical compounds or salts and not in the pigment paragraph, which is different from the facts at hand. In the *Siegle* case, 1 Ct. Cust. Appls. 32, T. D. 31005, if the "lakes" paragraph had not stated "not specially provided for" no doubt the conclusion would have been different.

In the second *Drakenfeld* case, *supra,* 9 Ct. Cust. Appls. 124, T. D. 37979, paragraphs 63 and 65 of the act of 1913 were in competition and were as follows:

63. * * * Ceramic * * * colors, whether crude, dry, mixed, or ground with water or oil or with solutions other than oil, not specially provided for in this section, * * *.

65. Salts and other compounds and mixtures of which * * * gold * * * constitute the element of chief value, * * *.

The collector assessed the goods as ceramic color under paragraph 63. The importers contended that it was a mixture in chief value of gold and should have been assessed under paragraph 65. The court affirmed the classification of the collector, stating that the same provision had been used in a prior tariff act and that Congress, by the repetition of the act of 1913, had indicated a purpose to include these particular kinds of colors (used in pottery arts) under paragraph 63. The court held, in this case, that while it is a general rule that the words "not specially provided for" have the effect of relegating commodities to other applicable paragraphs, that this well settled rule is applicable only when the goods are *equally* included within each of the competing paragraphs. This is equivalent to holding that ceramic color was not so *specifically* provided for elsewhere as to overcome the doctrine of use.

We think the decision in *Comstock & Theakston, supra,* is squarely in point with the case at bar on this issue. See also *United States* v. *Meyer & Lange,* 8 Ct. Cust. Appls. 27, T. D. 37163.

In deciding the specificity issue the court below said:

Plaintiffs also make the point that, in any event, the provision for all alloys used in the manufacture of steel is more specific, as regards alsimin whose only use is for that precise purpose, than is the provision in paragraph 374 for alloys of any kind in which aluminum is the component material of chief value, the uses of which run into the thousands. The decisions seem to support this contention, but as the proof amply shows that the imported merchandise does not come within the terms of paragraph 374 at all, it is not necessary to invoke this rule.

Probably the naming, in paragraph 302, of the many different kinds of alloys used in the manufacture of steel, as well as the "not specially provided for" clause in the same was overlooked, in arriving at the above conclusion.

The contention of the importer with reference to administrative practice can have no possible weight in the decision of this case since no such practice has been proven as would have any compelling force in the determination of this issue.

All that has been said and pointed out by both sides concerning legislative history convinces us that it is not, within itself, of controlling influence and if any weight is to be given to it, it would seem to us to support the contentions of the Government.

A consideration of the context of the two paragraphs as well as the various aluminum and bauxite provisions in the act would seem to indicate that it was the intention of Congress to require classification of the instant merchandise under paragraph 374. It is obvious that in carefully providing for a high duty on aluminum in all its different forms, it was the intention of Congress to see that the aluminum industry in this country had ample protection. The manufacture of aluminum, in its various forms, was, at the time of the enactment of the present tariff law, a thriving, growing business, and an examination of the various provisions in the act, and a consideration of the care shown in their construction, is convincing to us that Congress did not intend that an alloy in which aluminum is the component material of chief value should fall in the "catchall" alloy provision at the end of the paragraph, which provided, among other things, for numerous alloys used in the making of steel.

The protest of appellees should have been overruled and the judgment of the United States Customs Court, sustaining the protest, is *reversed.*