(C.D. 2148)

EMPIRE FINDINGS CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 1, 1960)

*Siegel, Mandell & Davidson* (*Joshua M. Davidson* and *David Serko* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill*, trial attorney), for the defendant.

RAO, Judge: Certain imported otoscopes were classified by the collector of customs at the port of New York as surgical instruments and assessed with duty at the rate of 45 per centum ad valorem, pursuant to the provisions of paragraph 359 of the Tariff Act of 1930, as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462.

Various claims have been interposed by plaintiff challenging the collector's action, and, while none of them has been waived, plaintiff relies principally upon the contention that the involved otoscopes are provided for in paragraph 353 of said act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, as electrical therapeutic (including diagnostic) instruments at the rate of 17½ per centum ad valorem. The alternative claims invoke other provisions of said paragraph 353, as modified by said General Agreement on Tariffs and Trade, or by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, for articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy; or for articles having as an essential feature an electrical element or device, and, respectively, dutiable at the rate of 15 per centum ad valorem, or 13¾ per centum ad valorem; as well as the provisions of paragraph 397 of said act, as modified by said General Agreement on Tariffs and Trade, for articles of base metal, which are dutiable at the rate of 22½ per centum ad valorem.

Insofar as here pertinent, the cited provisions read as follows:

Paragraph 359 and T.D. 52373, supplemented by T.D. 52462, *supra*:

Surgical instruments, and parts thereof, including hypodermic syringes and forceps, composed wholly or in part of iron, steel, copper, brass, nickel, aluminum, or other metal, finished or unfinished (except hypodermic and other surgical needles, and except instruments and parts in chief value of glass) _____ 45% ad val.

Paragraph 353 and T.D. 51802, *supra*:

Electrical apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

    Telegraph (including printing and typewriting), telephone, and therapeutic (including diagnostic) _____ 17½% ad val.

\*      \*      \*      \*      \*      \*      \*

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, \* \* \* all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

    Other articles (except \* \* \*) _____ 15% ad val.

Paragraph 353 and T.D. 52739, *supra*:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

  Other (except &ast; &ast; &ast;)_____ 13¾% ad val.

Paragraph 397 and T.D. 51802, *supra*:

Articles or wares not specially provided for, whether partly or wholly manufactured:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

  Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

  Other (except &ast; &ast; &ast;)_____ 22½% ad val.

One of the imported articles has been received in evidence as plaintiff's collective exhibit 1. Counsel have agreed that it is in chief value of a base metal, other than gold, lead, silver, platinum, tin, and tin plate, and that it is not plated with gold or silver, nor colored with gold lacquer. With the aid of a diagrammatic chart (plaintiff's exhibit 2), plaintiff's witness, Irving Speelman, a chemical engineer, with a background which includes studies in electricity and metallurgical engineering, as well as practical experience in subway power maintenance, described these otoscopes, which he likened to flashlights, as consisting of a handle or barrel into which batteries are inserted, and a head to which a speculum may be attached. There is an adjustable rear lens which is used for magnification and focusing of the instrument for the examination of the ear or nose of a patient. The witness explained that the batteries convert chemical energy into electrical energy which flows up slide wires to a rheostat, through rheostat wires into the center post connection of the head, through connecting wire to the center contact of a lamp, and through the lamp filament into the receptacle of the lamp. The current then returns through the body of the otoscope handle. The degree and direction of light are controlled by a rheostat button. In the opinion of this witness, the electrical elements in plaintiff's exhibit 1 are batteries, switch, wiring, lamp bulb, and rheostat. These, he stated, are essential to the functioning of the article, which could not operate without them. Further elaborating upon the electrical aspects of plaintiff's exhibit 1, the witness testified that electrical energy is produced in the batteries from chemical energy; it is distributed by

means of wiring to the lamp bulb; and is controlled by means of the rheostat and the switch.

The record also establishes that the witness Speelman is vice president of the plaintiff company, and director of development of its parent corporation, the Propper Manufacturing Co., Inc., which, respectively, import and manufacture various medical and surgical instruments and diagnostic equipment. He has held those positions for 4 years. Prior thereto, he was a civilian in charge of specifications for medical and surgical supplies and diagnostic equipment for the Armed Forces. It appears that Speelman was personally involved in the development and improvement of plaintiff's exhibit 1 and, in connection therewith, had visited doctors in various parts of the country to observe its use. It was his opinion that it is used by physicians and pediatricians, and sometimes otolaryngologists, for examining "the dark places of the ear and nose," as well as for the therapeutic purposes of draining fluid from the ear or introducing medication into the ear. This latter procedure is performed by means of a rubber tube and bulb attachment to the tube which projects from the head of the otoscope.

This witness stated that these otoscopes are bought and sold as electrical diagnostic instruments, not as surgical instruments. However, it was brought out, in response to interrogation by the court, that his experience in connection with sales by medical supply houses to physicians was limited to three or four dealers in the New York area.

It further appears that in his capacity as chief of the specifications branch dealing with surgical instruments, Speelman had been required to become familiar with surgical procedures. He gave as his definition of surgery "an operation on the living body, usually with instruments to either cure a condition or alleviate suffering." He stated that he had never seen exhibit 1 used in the performance of surgery, and was of opinion that, by virtue of its design, it was not practical to so employ it, for the reason that—

* * * the opening through which an instrument would have to be inserted in an operating procedure is very small. You would have to work over and above the lamp which is in the way and lastly, you would have to work with one hand because you would be holding the otoscope with the other.

Although this witness admitted that the magnifying glass in the head of the instrument could be removed, and an instrument inserted through the opening to perform some surgery, he stated that he had not observed such uses.

Plaintiff's second witness was Dr. Charles Breitman, a practicing physician in the State of New York for 47 years, who has specialized in otolaryngology since 1921. Dr. Breitman was graduated from Cornell Medical School in 1910, studied otolaryngology at the Post

Graduate Hospital in New York, at Long Island College Hospital, and Brooklyn Jewish Hospital, and had done some postgraduate work in Vienna. He is a diplomate of the American Board of Otolaryngology, having been admitted to the American Board in 1929.

Dr. Breitman, who was shown to be familiar with plaintiff's exhibit 1, testified that its primary purpose and principal use was as a diagnostic instrument. In use, the speculum of the instrument is inserted into the ear canal, the light is turned on, and an inspection is made of the drum and the canal. It may also be used therapeutically to insert powders or fluids or to withdraw fluids from the middle ear. Dr. Breitman stated that he finds it impractical to use exhibit 1 in surgery, because the opening is not adequate for operating purposes. He compared the otoscope with a head mirror, since they both serve the same function of introducing light into the ear canal and of lighting the ear drum, and stated that it is his preference to use the head mirror as a source of light in the performance of surgery. Based upon his knowledge of the profession, it was his opinion that otolaryngologists do not generally employ otoscopes for surgical purposes, for the reason that the head mirror affords greater freedom of action.

In the course of his practice, Dr. Breitman has had occasion to collaborate with other physicians engaged in the fields of pediatrics and general medicine. These are medical men who do not generally perform any surgery. On instances too innumerable to estimate, he has seen them use articles like exhibit 1 for diagnostic purposes. In fact, he stated, such an instrument is essential to the general practitioner and pediatrician, as neither is trained in the use of a head mirror and reflected light. On the contrary, exhibit 1 is not essential to the otolaryngologist or otologist because he is experienced in the use of the head mirror. He further stated that exhibit 1 is offered to the medical profession as an electrical diagnostic instrument; that it is primarily used for diagnostic purposes; that it has some use as a therapeutic instrument, but is seldom, if ever, used as a surgical instrument.

Called as a witness on behalf of defendant, Dr. Edward A. Meyers stated that he is a duly licensed practicing physician in the States of New York and New Jersey. He is a graduate of Albany Medical College, class of 1950, who interned at Waterbury Hospital in Waterbury, Conn., and served for 2 years in the United States Air Force, devoting most of that time to otolaryngology. For a period of 39 months thereafter, he undertook an ear, nose, and throat residency at the Manhattan Eye and Ear Hospital and has since been engaged in practice in Englewood, N.J. Dr. Meyers is a member of the American Medical Association, the Bergen County Medical Society, and the American Academy of Otolaryngology and Ophthalmology.

Dr. Meyers stated that, in the course of his practice, he uses an otoscope, more or less exactly similar to plaintiff's exhibit 1, for the following purposes:

* * * in the visualization and examination of the contents of the external ear canal and the ear drum itself for evaluating the appearance and the characteristics of the drum as an aid in interpretation of various types of ear problems. It is used with its magnification to get a better interpretation, a better delineation of marks and other characteristics to aid in coming to a conclusion in various types of ear problems. It is also used to remove various things in the ear canal or the ear drum and its contents itself.

He also uses a head mirror, but finds it easier to use the otoscope on children, because of their inability to remain in a fixed position. When he uses an otoscope for the purpose of making an incision in the eardrum or of removing polyps from the ear, he removes the inner earpiece and passes a slender instrument, such as a snare or a forceps, through the sleeve and through the speculum into the desired place within the ear itself.

Dr. Meyers further stated that in the sense that he would call a head mirror a surgical instrument, he would so describe an otoscope, but he would not consider exhibit 1 as a surgical instrument in any real sense. In his experience, he found that otoscopes are chiefly used for diagnostic purposes. So far as he personally is concerned, 60 to 75 percent of the time he uses an otoscope, it is for purposes of diagnosis. The remainder of the time he employs the instrument as a means through which to perform surgery.

This record establishes, without question, that the electrical element is an essential feature of the subject otoscopes, without which they could not function for their intended purpose. But whether or not they are subject to the comprehensive provisions of paragraph 353, *supra*, depends upon whether or not they have been properly classified as "surgical instruments."

The provision for surgical instruments first appeared as a separate tariff enumeration in paragraph 359 of the Tariff Act of 1922. In construing that provision in the case of *Keer, Maurer Co. et al.* v. *United States*, 47 Treas. Dec. 321, T.D. 40750, our predecessor tribunal, the Board of General Appraisers, held it to be a use designation, covering such instruments only as were chiefly, and exclusively, used in surgery. It was there stated:

The logical reasoning there employed [*United States* v. *Ducommun Hardware Co.*, 7 Ct. Cust. Appls. 353, T.D. 36904] is equally applicable to the present provision for "surgical instruments." In enacting it for the first time and predicating its operation entirely upon the use of an instrument, Congress clearly intended it to cover such instruments, even though the latter may also belong to one or more of the general classes of articles elsewhere provided for. * * *

In the case of *Kny-Scheerer Corporation of America* v. *United States*, 50 Treas. Dec. 18, T.D. 41670, affirmed in *United States* v.

*Kny-Scheerer Corporation of America*, 14 Ct. Cust. Appls. 446, T.D. 42080, the principle that the provision for surgical instruments is a use designation which contemplates "scientific instruments used exclusively in the science of surgery," was reiterated in a learned and exhaustive opinion by Fischer, J., in connection with the problem of whether certain forceps were more appropriately provided for under the Tariff Act of 1922, as hand forceps, than as surgical instruments. The record in the case having established conclusively that the forceps in issue were surgical forceps, and so designated commercially, the ultimate question posed by the court was, "What did Congress understand the term 'surgical instruments' to mean, and what articles did Congress intend to be embraced within that designation." After considering various data presented to Congress at the time the provision in question was contemplated, this court observed:

Petitions from hospitals and distinguished surgeons from all sections of the United States were presented to the congressional committees asking for a separate provision for surgical instruments at a comparatively low rate of duty, on the grounds, first, that the great bulk of surgical instruments is sold to hospitals and there used to a considerable degree in purely charitable work; second, that such instruments do not enter into the general commerce, i.e., used by the public generally, as do pocketknives, household scissors, etc.; third, that the soft metal instruments, such as dilators, retractors, etc., are not imported, but are of domestic manufacture, and therefore need no high duty; and fourth, that hard steel instruments, such as knives, scissors, and forceps, which are necessarily of a high grade of workmanship, are not made extensively in the United States because we have not as yet developed many artisans skilled in this restricted or limited industry.

Such apparently were the reasons which moved Congress to make a separate classification for surgical instruments, and to impose thereon a lower rate of duty than those exacted on articles of cutlery. And in view of the fact that surgical forceps constitute approximately from one-third to one-half, both in quantity and value, of the total class of surgical instruments, the Government's contention that Congress intended to exclude such a large portion of the great body of surgical instruments from the benefits of the new paragraph does not commend itself to our sense of reason.

Upon appeal, the rationale of the trial court's decision was warmly endorsed in an opinion in which it was also remarked that Congress had evidently given careful consideration to the provision for surgical instruments, as well as the provision for dental instruments, also enumerated in said paragraph 359, but separately and at a different rate.

In the 1929 Summary of Tariff Information, which is a compilation of the United States Tariff Commission furnished to the Committee on Ways and Means of the House of Representatives in connection with the preparation of the Tariff Act of 1930, Congress was apprised of the rulings in the cited cases in the following commentary:

28

DECISIONS

*Surgical forceps* were held to be dutiable as surgical instruments, paragraph 359, rather than as forceps under paragraph 354. (14 Ct. Cust. Appls. 446, and numerous other decisions.) *Surgical scissors* were held dutiable under paragraph 359 rather than under the provision in paragraph 357 for "all scissors," the designation by use controlling over the eo nomine designation. (G.A. 8730, T.D. 39967). Among other articles held dutiable as surgical instruments under paragraph 359 are *needles* used exclusively in surgery (G.A. 8958, T.D. 40759) ; *electric lamps* chiefly used as parts of surgical instruments (Ab. 49975) ; *stethoscopes* (Ab. (N) 6228) ; and *tweezers* (Ab. (N) 7061).

In reenacting the provision for surgical instruments with no other change than the addition of the phrase "including hypodermic needles, hypodermic syringes, and forceps," Congress is presumed to have sanctioned the interpretation placed by the courts upon its initial use of the language. *United States* v. *Loffredo Bros., Gehrig, Hoban & Co., Inc.*, 46 C.C.P.A. (Customs) 63, C.A.D. 697. That is to say that Congress is presumed to have agreed that the construction of the surgical instruments provision as a use designation covering instruments exclusively used in surgery, properly expressed its intent.

We are not dissuaded from this conclusion by the fact that among the decisions called to the attention of Congress, *supra*, were those involving stethoscopes (Ab. (N) 6228) and tweezers (Ab. (N) 7061). Both cases are reported in the abstract, so briefly as to give no clear-cut indication of their actual purport. From what little is reported, it appears that the case involving stethoscopes turned upon a failure of proof of the claim that the stethoscopes were scientific or laboratory instruments, rather than surgical instruments, as classified by the collector; while the case involving tweezers was decided under the authority of *United States* v. *Kyn-Scheerer Corporation of America, supra*, upon stipulation of counsel.

A somewhat broader construction of the surgical instruments provision may be found in the case of *Jensen Salsbery Lab., Inc.* v. *United States*, 66 Treas. Dec. 363, T.D. 47313, decided after the 1930 act was passed. It was there held that certain imported plier-type devices, used by veterinarians for tagging the ears of cattle to identify those which had been treated with serum, were surgical instruments, under the principle that "the real test is whether the instrument forms part of the necessary equipment of a surgeon to enable him efficiently to practice his profession of surgery." Although this test extends the scope of the surgical instrument provision beyond the field of those articles actually employed in the performance of surgery, it is not a repudiation of the doctrine that surgical instruments are those only which are chiefly used by surgeons. Indeed, chief use by veterinary surgeons in performing the ear-piercing operations served as the basis for the court's decision.

Accordingly, whether or not an article may properly be considered to be a surgical instrument depends in the last analysis upon whether or not it is an instrument chiefly used by surgeons. And since, in the instant case, the collector has so classified the involved otoscopes, it must be presumed that he has found this fact to exist. *United States* v. *Zoltan Erdosi*, 40 C.C.P.A. (Customs) 137, C.A.D. 509.

Like the provision for surgical instruments, the provision in paragraph 353, *supra*, for electrical therapeutic instruments, including diagnostic apparatus, may also be termed a use designation. So, the plaintiff in this case has assumed the dual burden of negativing chief use by surgeons and of affirmatively establishing chief use in medicine for diagnosis. These are factual issues to be shown by a fair preponderance of positive testimony.

In ordinary instances where the principle of chief use applies, rules of evidence require that the testimony concerning use be representative of an adequate geographical cross-section of the country, and possess sufficient probity to establish that the great majority of people who might be likely to handle the article do, or do not, employ it in the manner claimed.

There are, however, exceptional circumstances under which these general rules might well be modified, as, for example, where it is established that the article in question is not adapted for the use under consideration, or for one reason or another it might be impractical to devote it to such a use. This was a circumstance which prompted this member of the court to state, in a dissenting opinion, in the case of *Greatrex, Ltd., and J. J. Gavin & Co., Inc.* v. *United States*, 30 Cust. Ct. 320, Abstract 57032, involving so-called travel irons, classified within the provisions of paragraph 339 of the Tariff Act of 1930 as household utensils:

* * * And if it was not practical to use the iron in controversy for household use, it is fairly and reasonably inferable that it was not chiefly used for that purpose.

Further support for this view may be found in the case of *United States* v. *F. W. Woolworth Co.*, 23 C.C.P.A. (Customs) 98, T.D. 47765, wherein the following is stated:

We are not unmindful of the rule that in order to establish "chief use" the evidence of use must relate to the United States generally, and not to a limited portion thereof. It may be proper to observe, however, that the question of whether "chief use" has been properly established depends upon the issues and the evidence in each case.

We think it is a proper deduction from the evidence and from the character of Exhibits 1, 2, and 3, that the involved articles would be used in substantially the same manner, and by substantially the same class of people in one section of the country as in another, and that evidence establishing their chief use in a large area of the country is sufficient under the rule.

The facts in the instant case would seem to suggest that an even less degree of evidence as to use would suffice.

There is implicit agreement between the parties that the instrument, the classification of which is here in question, is an otoscope. By definition, an otoscope is—

An instrument for viewing or examining the interior of the ear; especially, an ear-speculum. [Funk & Wagnalls New Standard Dictionary of the English Language, 1939.]

An instrument for examining internal parts of the ear; also, an instrument for auscultation of sounds in the ear. [The New Century Dictionary of the English Language, 1946.]

Obviously, therefore, its use is restricted to that branch of medicine which diagnoses and treats disorders of the ear. Hence, it is fair to assume that knowledge of the method of its use rests peculiarly and particularly within the minds of physicians and surgeons.

This court may well take judicial notice of the fact that medical procedures tend to become standardized, and that techniques of diagnosis and therapy are ordinarily disseminated throughout the medical world through the medium of journals, conventions, and, indeed, correspondence among leading authorities in the various specialties. Consequently, it is reasonable to infer that differences in procedures are not likely to exist on a purely geographical basis. And where a given medical instrument is used in one manner by physicians in one locality, its use by doctors elsewhere in the United States would probably not vary.

Moreover, plaintiff's expert, Dr. Charles Breitman, as a Diplomate of the American Board of Otolaryngology, may be considered competent to give evidence above and beyond his personal experience concerning the use of any given instrument in the branch of the profession in which he specializes, subject only to the qualification of his familiarity therewith. It may properly be assumed that his knowledge as a specialist extends to the manner in which such and similar instruments are handled by his colleagues, and transcends ordinary geographical limits. When he testified that it is impractical to use plaintiff's exhibit 1 in aural surgery, his evidence becomes proof of a very cogent nature to negative chief use of this article as a surgical instrument.

As this court had occasion to observe in the case of *Geo. S. Bush & Co., Inc.* v. *United States*, 37 Cust. Ct. 45, C.D. 1797:

* * * It is obvious that proof of exclusion from a class, insofar as chief use is concerned, does not require the same degree of generality as proof of inclusion within the class, in the absence of evidence showing use within a restricted area, only.

More than purely local knowledge may well be attributed to the statement of this witness that general practitioners, especially pedia-

tricians, make use of otoscopes for diagnostic purposes. His experience and background assuredly qualify him to testify concerning these matters, and his knowledge is imputable to other members of his profession, regardless of geographical location.

It is significant, too, that the evidence given by defendant's expert, Dr. Edward A. Meyers, an otolaryngologist and a member of the American Academy of Otolaryngology, tended to corroborate that of Dr. Breitman. In the experience of Dr. Meyers, exhibit 1 is an instrument chiefly used for diagnostic, rather than surgical, procedures.

To the extent that the testimony of these witnesses is deemed sufficient to negate chief use as a surgical instrument, it is of equal value in establishing affirmatively that the instant otoscopes are devices chiefly used for purposes of diagnosis.

In view of all the foregoing circumstances, and the fact that the evidence establishing that the electrical feature of exhibit 1 is essential to its proper functioning has not been controverted, we are of opinion that the presumption of correctness attaching to the collector's decision has been overcome, and that the plaintiff has established that the subject otoscopes are electrical therapeutic or diagnostic instruments within the purview of paragraph 353, as modified, *supra*, which are dutiable at the rate of 17½ per centum ad valorem.

It needs no elaborate discussion to support the conclusion that as respects the three separate portions of paragraph 353 upon which plaintiff rests its alternative claims, the provision for electrical therapeutic and diagnostic instruments is the most specific. Use is made the criterion for determination of its application, and its descriptive phraseology most narrowly embraces the electrical therapeutic or diagnostic instruments at bar. *A fortiori*, the provisions of paragraph 397, as modified, *supra*, for articles of metal, not specially provided for, are inapplicable to the instant merchandise.

By reason of the foregoing considerations, we hold the otoscopes here involved to be dutiable at the rate of 17½ per centum ad valorem, pursuant to the provision in paragraph 353, as modified by the General Agreement on Tariffs and Trade, *supra*, for electrical therapeutic (including diagnostic) instruments. The claim in the protest to that effect is sustained. All other claims are, however, overruled.

Judgment will be entered accordingly.

#### DISSENTING OPINION

Ford, Judge: The provision for surgical instruments under which the classification of this merchandise was made by the collector of customs and the claim of plaintiff under the provision for diagnostic instruments are both use provisions.

It is well settled that when use is a determinative factor in the classification of imported merchandise, the chief use is controlling, *United States* v. *James P. Heffernan Paper Co.*, 17 C.C.P.A. (Customs) 61, T.D. 43358. Chief use is a question of fact which must be established by positive testimony.

Since chief use is the legal principle involved herein, it was incumbent upon plaintiff to affirmatively establish chief use of the involved otoscopes by testimony representative of an adequate geographical cross-section of the Nation. The physician called on behalf of plaintiff testified that the involved otoscopes are used for diagnosis and therapeutic purposes, are not used by a surgeon, and are, in his opinion, not surgical instruments. The record establishes that this witness is licensed to practice medicine in the State of New York. There is no indication nor affirmative evidence that his testimony as to his opinion is based upon experience other than in the State of New York. The physician who testified on behalf of defendant corroborated in part the testimony of plaintiff's witness by indicating that, in his personal use of an otoscope, 60 to 75 percent of the time, it was as a diagnostic instrument and 25 to 40 percent of the time as a surgical instrument. However, the experience of this witness appeared to be limited to New York and New Jersey. The trade witness called on behalf of plaintiff, although alluding to visiting doctors in various parts of the country, did not establish in what states or parts of the country he had visited.

In spite of the fact that physicians called both on behalf of plaintiff and defendant indicated that, in their own personal experience, the otoscopes were not chiefly used as surgical instruments, and the commercial witness called on behalf of plaintiff testified that said otoscopes were sold as electrical diagnostic instruments, such proof falls short of overcoming the presumption attaching to the classification that such otoscopes were chiefly used as surgical instruments. This is particularly so when the commercial witness was actually present at the time sales were made to doctors, only in the New York area.

Testimony as to the chief use of otoscopes as diagnostic or therapeutic instruments in one or two states or in a limited section of the country is likewise insufficient. *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, T.D. 42240. Since the testimony fails to establish chief use generally, plaintiff has failed to meet the burden of proof imposed upon it. The case of *United States* v. *F. W. Woolworth Co.*, 23 C.C.P.A. (Customs) 98, T.D. 47765, relied upon by the majority opinion herein, also supports my position with respect to the evidence necessary to establish chief use. The court, in the *Woolworth* case, *supra*, which involved uninflated rubber balls,

classified as toys under the provisions of paragraph 1513 of the Tariff Act of 1930 and claimed to be properly dutiable under paragraph 1502 of the Tariff Act of 1930, as balls, primarily designed for use in physical exercises, concluded that the imported balls would be used in the same manner and by substantially the same class of people in one section of the country as in another. However, the evidence therein established the chief use of the involved balls "in a large area of the country." The court therein concluded that such evidence was sufficient under the rule. As indicated, *supra*, the evidence herein establishes at best chief use in two states.

While judicial notice may be taken of well-known uses of an article, chief use must be established by positive testimony. *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 C.C.P.A. (Customs) 161, C.A.D. 544. The facts in the case at bar and those of the *Tobert* case, *supra*, are strikingly similar. In the instant case, the involved otoscopes are instruments familiar to most of us who have had any contact with the medical profession, and, as such, it is tempting to apply judicial knowledge of chief use, as the late Judge William P. Cole, Jr., stated in his opinion in the *Tobert* case, *supra*. Particularly pertinent herein is the following observation made in the *Tobert* case, *supra*:

* * * It is tempting, therefore, for us to apply our judicial knowledge on the subject and once and for all determine the classification of such articles for tariff purposes in the future. We recognize, however, that despite what may be the experience and knowledge of one judge or another, such may not be in line with the chief use as determined via proof, which seems to us must be available in quantity and quality sufficient to assist the court in future litigation. It is to be regretted that the record in the case before us is not in that category. We find it almost totally unacceptable for such purposes.

Accordingly, I am of the opinion that the court may not take judicial notice of the fact that medical procedures tend to become standardized. What is standard in one section of this Nation may not be standard in another, and it is, in my opinion, improper for this court to take judicial notice of this fact. The facts in the case at bar appear to be reason enough for the court not to take judicial notice, since the two doctors who were called to testify do not appear to use the involved otoscopes in the same manner. While Dr. Breitman never uses the instruments for surgery, Dr. Meyers uses the same instruments from 25 to 40 percent of the time for surgical procedures. The chief use of the involved instruments should, in my opinion, have been established by competent evidence and may not be proven by the application of the principle of judicial notice by the court.