**INSTRUMENTATION ASSOCIATES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

C.D. 3022;  Protests 60/17157–1029–60, etc.

United States Customs Court
Second Division.

June 1, 1967.

Seigel, Mandell & Davidson, New York City, (Allan H. Kamnitz and David Serko, New York City, of counsel) for plaintiff.

Carl Eardley, Acting Asst. Atty. Gen., Richard J. Kaplan and Avram Weisberger, New York City, Trial Attys., for defendant.

Before RAO, Chief Judge and FORD, Judge.

RAO, Chief Judge:

The proper tariff classification of certain respiratory testing instruments imported from Holland is the question the court is here called upon to determine.

Instruments with six different designations are involved and are covered by six protests, the consolidation of which protests has been granted by the court, and their enumeration is contained in the schedule attached to and made a part of this decision.

At the time of importation, the merchandise was classified by the customs officials as laboratory apparatus in paragraph 360 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and assessed with duty at the rate of 25½ per centum ad valorem.

Within the time prescribed by statute (19 U.S.C. § 1514), protests were filed against such action. Either by said protests or by amendments thereto, permission for which was granted at the time of trial, plaintiff contends the merchandise should properly have been classified as electrical therapeutic (including diagnostic) instruments (other than laboratory) in paragraph 353 of said tariff act, as modified, supra, and subjected to duty at the rate of 15 per centum ad valorem, or as articles having as an essential feature an electrical element or device in said paragraph 353, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and duty imposed thereon at the rate of 13¾ per centum ad valorem. Other claims in the protests having been specifically abandoned will not be considered and will be dismissed.

The pertinent provisions of the tariff act read as follows:

Paragraph 360 of the Tariff Act of 1930, as modified by the sixth protocol, supra:

* * * laboratory instruments, apparatus * * * and parts thereof * * *:

Slide rules * * *
Other * * * ............... 25½% ad val.

Paragraph 353 of said act, as modified by the sixth protocol, supra:
Electrical therapeutic (including diagnostic) apparatus, instruments (other than laboratory), * * * ....................15% ad val.

Paragraph 353 of said tariff act, as modified by the Torquay protocol, supra:

Articles having as an essential feature an electrical element or device, * * * finished or unfinished, wholly or in chief value of metal, and not specially provided for:
* * * * * * * * *
Calculating machines * * *
* * * * * * * * *
Other * * * ............... 13¾% ad val.

———◆———

When this case was called for hearing, the parties hereto stipulated and agreed to the fact that the merchandise involved herein consists of electrical apparatus, instruments, or devices composed wholly or in chief value of metal, having as an essential feature an electrical element or device.

Two witnesses were called to testify for the plaintiff and two for the defendant.

The first of plaintiff's witnesses was William Gruen, president of the plaintiff corporation, for the past 11 years. Prior thereto he was employed for 17 years with the medical equipment house which is currently doing business under the name of United States Hospital Supply, where he rose from errand boy to the position of executive of the company. His duties consisted of selling, instructing, repairing, and installing medical diagnostic equipment.

Plaintiff's second witness was Dr. Harold A. Lyons, whose background is reflected by a "Curriculum Vitae" received in evidence as plaintiff's exhibit 9. Dr. Lyons' main occupation at present is as Professor of Medicine at Downstate Medical Center in Brooklyn where he has been on the faculty for 11 years. His duties include operating a clinic service, teaching, and doing laboratory work. He is in charge of the pulmonary diseases division and all the patients referred to him have some problem with their respiratory system.

Dr. Donald C. Kent was the first witness called on behalf of defendant. A "Curriculum Vitae" consisting of four pages, received in evidence as defendant's exhibit A, sets forth Dr. Kent's educational background, his experience, memberships in various professional societies, his professional certifications, and professional writings. At the present time, he is Assistant Chief of Medicine at the United States Naval Hospital at St. Albans, New York, and head of the chest service and cardio-pulmonary laboratory at said institution. His prior tour of duty was at the United States Naval Hospital in San Diego, California, where he was also the head of chest services.

As defendant's second witness Dr. Anthony Damato was called to testify. After graduating from Georgetown University and serving internship and residencies in Washington, D. C., and Jersey City, New Jersey, he subsequently entered the Public Health Service at Staten Island, New York, where for the past 3 years he has served as Director of Research. He is a member of the American Medical Association and of the Hudson County Medical Society. As chief of the cardio-pulmonary section in the United States Public Health Service at Staten Island, he is in charge of a staff of professional and non-professional people. It is their responsibility to provide consultative diagnostic service and to conduct research.

During the course of the proceedings, on motion by plaintiff, the record in the case of Instrumentation Associates v. United States, 51 Cust.Ct. 136, C.D. 2421, was incorporated into the record herein. Involved in the cited case were a "Pulmotest" and a "Pulmo-analysor" which had been classified by the customs authorities as surgical instruments in paragraph 359 of the Tariff Act of 1930, as modified. It was the position of plaintiff therein that said instruments should properly have been classified as electrical diagnostic instruments in paragraph 353 of said act, as modified. The court held in that case that the Pulmotest and Pulmo-analysor in issue were not devices used by surgeons in the practice of their profession but were used by medical practitioners in the course of their examination and diagnosis of patients suspected of having respiratory diseases or disorders and, therefore, said articles should properly have been classified as electrical diagnostic instruments (other than laboratory) in paragraph 353 of the Tariff Act of 1930, as modified, as claimed by plaintiff.

The six different types of instruments involved in the present case are represented by illustrative exhibits in evidence and are described in the testimonial record as follows:

Exhibit 1 is a pamphlet which illustrates a pneumotachograph. Said instrument was described as a device for the detection and display of the instantaneous changes in the flow of breath or gasses in and out of the lungs of a patient.

Exhibit 2 provides an illustration of an expirograph, also referred to in the entry papers as single breath air basal apparatus. An expirograph was described as a spirometer, which is a water bucket in which a thin metal ball rides. As the gasses or breath of the patient moves in and out of this system the ball rises and falls proportionally to the volume inhaled and exhaled. This movement is transmitted to a pen which makes a record on a piece of paper.

Exhibit 3 is a photo of an air basal metabolism apparatus. This device was also described as a spirometer which performs the function of recording on a piece of paper the volume of breath inhaled and exhaled by a patient and, in addition, by means of an automatic device, the amount of oxygen consumed by a patient being tested is determined.

Exhibit 4 is illustrative of the instrument known as a pulmonet which is a spirometer serving the same function as does exhibit 2, but with the addition of a means to measure the concentration of helium.

Exhibit 5 contains an illustration of a pulmometer. The testimonial record discloses that a pulmometer is a water-sealed spirometer identical to exhibit 2 except for the modification that, instead of providing a recording on a piece of paper, it provides a direct reading on a dial.

Exhibit 6 depicts a nitrograph which is described in the testimonial record as an instrument to determine the concentration of nitrogen in the patient's breath and functions on the principle of a neon sign. Nitrogen, if put under similar conditions as found in a neon sign, will make a blue light. The intensity of the blueness is an indication of the concentration of nitrogen present. It is such intensity which is measured and indicated on a meter incorporated in the instrument known as a nitrograph.

As plaintiff's exhibits 7 and 8, there were received in evidence illustrations of the "Pulmotest" and the "Pulmoanalysor," the instruments which were the subject of decision in the case incorporated herein, and it is disclosed by the testimony of the witnesses that said exhibits 7 and 8 are similar to and can perform the functions of exhibits 2 through 5 in the instant case.

As to the place and nature of the use of the articles presently in controversy, Witness Gruen testified that he had sold between 200 and 250 instruments like exhibits 1 through 6 since they came into existence, and that he had sold them throughout the United States to clinics, doctors' offices, and to hospitals. He estimated that about 40 percent of the instruments were sold to hospitals and 60 percent to doctors' offices and to diagnostic clinics. He described a clinic as a medical office or center, where patients are examined and their illness diagnosed. Witness Gruen testified to attending between 15 and 18 medical conventions a year over the past 10 years for the purpose of displaying exhibits 1 through 6, explaining their functions, and soliciting orders. Said meetings are held in the population centers of the United States—New York, Chicago, San Francisco, Denver, St. Louis, Cleveland, New Orleans, and Miami, and are attended by physicians with various specialties in the medical profession. Based upon his experience in selling the involved instruments, servicing them, teaching others how to use them, observation of their actual use, and discussions as to their use with physicians at medical conventions, whether such use was in doctors' offices, diagnostic clinics, or in hospitals, Witness Gruen stated that exhibits 1 through 6 are chiefly used for the specific purpose of establishing a patient's condition or the gravity of a particular medical condition.

Doctor Lyons also testified to attending meetings, conventions, and conferences of the numerous medical associations of which he is a member and on those occasions having met other doctors from various parts of the country and discussed diagnostic procedures with them. Predicated upon his knowledge, experience, and observation of the use of

exhibits 1 through 6, Dr. Lyons stated that their chief use throughout the country would be to diagnose the respiratory functioning of patients.

Defendant's first witness, Dr. Donald C. Kent, stated that he had not seen instruments like exhibits 1 through 8 used other than in a cardio-pulmonary laboratory, which he described as that portion of an institution or hospital where studies are made in an integrated manner of the physiological functioning of a patient's cardio-respiratory system. He stated that all of the imported instruments are used to perform pulmonary tests on humans. Based upon his experience in the medical profession and particularly predicated on his pulmonary specialty, Dr. Kent stated that instruments such as exhibits 1 through 8 would generally be used in a cardio-pulmonary laboratory rather than elsewhere and that, although said instruments are used in the field of research as well as in the field of patient care at the Naval hospital with which he is associated, the major use of the instruments would be for patient care, diagnosis, and disability rating.

It was the testimony of defendant's witness Dr. Damato that he was present in the courtroom while Dr. Kent was testifying and that he agrees essentially with said testimony concerning the functions and uses of the instruments involved in the instant case. Towards the conclusion of his testimony the following appears:

Q. Doctor, based upon your knowledge and experience in dealing with Exhibits 1 through 6 or their counterparts, have you an opinion which you can state with some certainty as to the chief use of these items?—A. I would say their most predominant use is probably in the area of clinical diagnostic work, but not to exclude their use in the performance of research studies, too.

■ This case has been carefully briefed with both parties pressing their opposing positions with a commenda-

ble show of reason. It appears to the court, however, that the basic question here involved has been resolved by prior judicial authorities which have held that place of use is not the controlling consideration in a determination of what constitutes a laboratory instrument for customs duty purposes, but rather the fact that such an instrument is used for laboratory purposes. R. J. Saunders & Co., Inc. v. United States, 45 CCPA 87, C.A.D. 678. And use for laboratory purposes has been construed to mean use for experiment or study. The A. W. Fenton Co., Inc. v. United States, 49 Cust.Ct. 242, Abstract 67085. See also J. E. Bernard & Co., Inc. v. United States, 52 Cust.Ct. 20, C.D. 2428, which involved certain vitascopes used principally by seed dealers for determining the germinating capacity for seeds and Westinghouse Electric Corporation v. United States, 55 Cust.Ct. 271, C.D. 2589, pertaining to vacuum furnaces used to manufacture a metal alloy to a higher degree of purity than would be obtainable by other means.

The record before the court, when stripped to its basic essentials as applied to the issue here presented, discloses both by the testimony of defendant's witnesses as well as by that of plaintiff's that the place of use of the instant instruments is chiefly in cardio-pulmonary laboratories in hospitals and that their purpose is to check the respiratory functioning of a patient to determine whether a deficiency therein is causing the illness for which the examining physician must prescribe. Such being their use, we look to the definition of the words "diagnostic" and "diagnosis" which appear in Webster's Third New International Dictionary of the English Language, Unabridged, 1966, as follows:

diagnostic *adj* * * * 1 : adapted to or used for the furthering of diagnosis : employing or marked by the methods of diagnosis : concerned with diagnosis * * * 2 : serving to distinguish, identify, or determine : DISTINCTIVE: as a : characteristic of or

indicating the presence of a particular disease * * *

diagnosis *n.* * * * 1 : the art or act of identifying a disease from its signs and symptoms * * *

■ Since the overall testimony in the case at bar supports a finding that the articles before the court are instruments used in the process "of identifying a disease from its signs and symptoms," we are of the opinion that the articles in controversy come within the common meaning of the term "diagnostic instruments."

■ Defendant seeks to negate classification of the instant merchandise as diagnostic instruments on the grounds that the devices in themselves do not diagnose or identify a disease. In our opinion, to so hold would give to the term "diagnostic instruments" a strained and uncommon meaning whereas it is the duty of the court to interpret statutory language according to its common everyday usage in the absence of evidence of a different commercial designation. Marshall Field & Co. v. United States, 45 CCPA 72, C.A.D. 676.

The court is further of the opinion that it is clear from the record here presented that the six instruments at bar, used to test or measure pulmonary ventilation, provide the examining physician with information which by itself or coupled with the results of other tests will enable the doctor to determine the malfunctioning of a patient and, predicated on said diagnosis, to prescribe for its treatment and alleviation or correction.

For diagnostic instruments to be included within the tariff provision therefor in paragraph 353 of the Tariff Act of 1930, as modified, they must be such instruments as are chiefly so used. When confronted with the same question in the prior *Instrumentation Associates* case, C.D. 2421, the record in which case has been incorporated herein, this court stated in its decision—

On the matter of "chief use," we quote from the decision of our appellate court in the case of United States v. F. W. Woolworth Co., 23 CCPA 98, T.D. 47765, as follows:

We are not unmindful of the rule that in order to establish "chief use" the evidence of use must relate to the United States generally, and not to a limited portion thereof. It may be proper to observe, however, that the question of whether "chief use" has been properly established depends upon the issues and the evidence in each case.

We think it is a proper deduction from the evidence, and from the character of Exhibits 1, 2, and 3, that the involved articles would be used in substantially the same manner, and by substantially the same class of people, in one section of the country as in another, and that evidence establishing their chief use in a large area of the country is sufficient under the rule.

The evidence of record in the instant case consists of the unrefuted testimony of plaintiff's witness, Dr. Harold A. Lyons. It was the testimony of Dr. Lyons, a Fellow of the American College of Chest Physicians and Official Examiner of doctors practicing throughout the United States, and a member of many medical associations, the conventions and meetings of which he attends, that use of the instant Pulmotest and Pulmo-analysor generally throughout the medical profession in the United States was in the diagnosis and treatment of respiratory diseases and disorders.

As was stated in the decision of the court in the *Empire Findings* case, supra [44 Cust.Ct. 21, C.D. 2148]—

This court may well take judicial notice of the fact that medical procedures tend to become standardized, and that techniques of diagnosis and therapy are ordinarily disseminated throughout the medical world through the medium of journals, conventions, and, indeed, correspondence among leading authorities in the various specialities. Conse-

quently, it is reasonable to infer that differences in procedures are not likely to exist on a purely geographical basis. And where a given medical instrument is used in one manner by physicians in one locality, its use by doctors elsewhere in the United States would probably not vary.

Not only did Dr. Lyons give similar testimony as to the six instruments covered by the instant controversy, but said testimony was corroborated by plaintiff's witness Gruen predicated on an extensive and active engagement in the medical equipment field. In view of said unrefuted testimony, the court is here of the opinion that the six instruments at bar which have been proven by the record herein to come within the common meaning of the term "diagnostic" have also been shown to be "diagnostic instruments" in the tariff sense by virtue of their chief use throughout the United States as an aid to physicians in identifying a disease or illness from its signs and symptoms.

We are not deterred from this view by the fact, as indicated in the testimonial record herein, that instruments such as those in controversy may at times be used for research and thus be considered employed for laboratory purposes. A similar consideration was presented in the *Westinghouse Electric* case cited, supra, involving high vacuum melting and casting furnaces, and was disposed of as follows—

> Inasmuch as the record before us discloses that the VSG–10 and VSG–25 high vacuum melting and casting furnaces at bar are used for commercial purposes, to wit, the production of ingots of pure metal alloys, said furnaces are not, in our opinion, laboratory instruments in paragraph 360 of the Tariff Act of 1930, as modified, supra, * * *. Since it has been established that the imported devices produce a merchantable product, *the further fact that some of said product is used for purposes of experiment or study does not make of the apparatus*

> *which produces it a laboratory instrument.* [Emphasis ours.]

It is chief use which must govern the tariff classification of the instant merchandise.

Defendant attempts to minimize the effect of the former *Instrumentation Associates* case reported in C.D. 2421, supra, on the grounds that the competition in said case was between "surgical instruments" and "diagnostic instruments" and contends that the court "did not come to grips with the issue of whether they were 'laboratory instruments.'" It might be pointed out that the provision of paragraph 353 of the tariff act, as modified, found applicable in that case, provides for electrical therapeutic (including diagnostic) instruments *(other than laboratory)*. The holding of the court clearly indicates, therefore, that the articles there in issue were such electrical therapeutic (including diagnostic) instruments as were not chiefly used for laboratory purposes of experiment or study.

The Government also makes reference to the case of Carmichael Forwarding Service, a/c Dallon's Laboratories, Inc. v. United States, 56 Cust.Ct. 256, C.D. 2634, wherein the court overruled the protest claim for classification of certain electronic amplifiers or micromanometers as electrical therapeutic instruments (other than laboratory), in paragraph 353 of the Tariff Act of 1930, as modified. In said *Carmichael* case, it was pointed out that it was the duty of protestant, *inter alia*, to prove a positive and a negative, the positive being that the devices there involved were chiefly used for diagnostic purposes, and the negative that said devices were not used for laboratory purposes of experiment or study. Plaintiff did not succeed in said *Carmichael* case for failure to meet its burden of proof.

As indicated, supra, plaintiff has set forth an alternative claim for classification of the instruments at bar as being essentially electrical articles of the kind provided for in paragraph 353 of the Tariff Act of 1930, as modified by the

Torquay protocol, supra, for which duty at the rate of 13¾ per centum ad valorem is provided. It has been agreed by the parties hereto that, in fact, the instruments at bar are articles having as an essential feature an electrical element or device. Therefore, said instruments, if not elsewhere more specifically provided for, would come within the purview of plaintiff's alternative claim. We are, therefore, called upon to determine which of the alternatively claimed provisions of paragraph 353 is more specific. In this regard, as stated in the case of United States v. Lansen-Naeve Corp., 44 CCPA 31, C.A.D. 632—

> * * * A well settled rule of specificity is that a use provision prevails over a descriptive or *eo nomine* provision, United States v. Snow's United States Sample Express Co., supra [8 Ct.Cust.Appls. 351, T.D. 37611], unless there is a clearly expressed congressional intent to the contrary. United States v. Pfaltz & Bauer (Inc.), et al., 16 Ct.Cust.Appls. 358, T.D. 43091; United States v. John H. Faunce (Inc.) et al., 21 C.C.P.A. (Customs) 80, T.D. 46395.

As applied to the circumstances of the present case, not only is it true that the provision in paragraph 353 for electrical therapeutic (including diagnostic) instruments is a use provision, whereas the provision in said paragraph for articles having as an essential feature an electrical element or device is not, but it is also true that the diagnostic instruments provision of the tariff act more closely describes the device in controversy than the provision for essentially electrical articles. United States v. Electrolux Corporation, 46 CCPA 143, C.A.D. 718.

We are of the opinion, therefore, that the statutory provision for electrical therapeutic (including diagnostic) instruments in paragraph 353 of the Tariff Act of 1930, as modified by the sixth protocol, supra, providing duty at the rate of 15 per centum ad valorem, more specifically describes the instruments at bar and controls their classification and duty assessment. We so hold. That claim in the protests will, therefore, be sustained. The claim in the protests for classification under the essentially electrical articles subdivision of paragraph 353 of the tariff act, as modified, is overruled. All other claims, having been abandoned, are dismissed.

Judgment will be entered accordingly.