ATAKA AMERICA, INC.

v.

UNITED STATES.

**C.D. 4637, Court No. 73–6–01576–S.**

United States Customs Court.

Feb. 20, 1976.

4. See generally, Tariff Classification Study, Schedule 4, page 2.

Rode & Qualey, New York City (Ellsworth F. Qualey and Peter Jay Baskin, New York City, of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (John A. Gussow, New York City, and Jerry P. Wiskin, trial attorneys), for defendant.

BOE, Chief Judge:

The merchandise in question in the above-entitled action, described on the commercial and special invoices as "Olympus Upper GI Photofiberscope, Model GIF–D, without CLE and FIT," was imported from Japan and entered at the port of New York on April 18, 1972.*

Upon liquidation the merchandise was classified under item 709.05, TSUS, as modified by T.D. 68–9, providing:

Schedule 7, Part 2, Subpart B, TSUS

Medical, dental, surgical and veterinary instruments and apparatus (including electro-medical apparatus and opthalmic instruments), and parts thereof:
Optical instruments and appliances, and parts thereof:

\* \* \* \* \*

709.05    Other ................. 25% ad val.

The plaintiff, however, contends that said merchandise is more than a medical-optical instrument and claims that the same is properly classified as an electro-medical apparatus, and parts thereof, under item 709.-17, TSUS, as modified by T.D. 68–9, providing:

Schedule 7, Part 2, Subpart B, TSUS

Medical, dental, surgical and veterinary instruments and apparatus (including electro-medical apparatus and opthalmic instruments), and parts thereof:
Optical instruments and appliances, and parts thereof:

\* \* \* \* \*

Other:

\* \* \* \*

Electro-medical apparatus, and parts thereof:

\* \* \* \*

709.17        Other ........ 6% ad val.

From the exhibits and the testimony introduced, it appears that the instrument in question, commonly referred to as a fiberscope, consists of three major parts: a flexible insertion tube, a control unit, and a light guide portion. The tube portion of the instrument, designed to be inserted through the mouth and throat of the individual for the purpose of examining the esophagus, stomach and gastrointestinal areas of the body, consists of six channels: (1) a channel for suction, biopsy and cytology purposes; (2) a channel for visual observation consisting of the lens and a bundle of glass fibers; (3) and (4) channels for light illumination; (5) a channel for water, and (6) a channel for air.

The second portion of the instrument, referred to as a control unit, possesses an angle control mechanism which directs the tip of the fiberscope and also includes a mechanism for the control of air, water and suction, a biopsy port or opening and an eyepiece lens. The third portion of the instrument, a light guide portion, can be attached to a light source and power supply—a separate instrument described as model CLE. The power supply unit, although not a part of the imported merchandise in question, is suitable only for use with the fiberscope and provides the electricity required for the production of light and the operation of the instrument. The medical camera, referred to as FIT, although not a part of the imported merchandise in question, likewise is suitable only for use with the fiberscope. The light which is produced initially in the power supply unit is transmitted through the bundle of glass fibers within the fiberscope providing the illumination necessary for visual observation as well as the utilization of the other

---

\* CLE is a specially designed light power unit used in connection with the fiberscope. FIT is a camera specially designed for use in connection with the fiberscope.

capabilities of the instrument hereinbefore described.

From the expert medical testimony presented at the trial of the within action, all witnesses agreed that the extent of use of the additional capabilities of the instrument in question depended in large part upon the custom and practice in each individual hospital. Although the defendant's medical witness indicated that in the New York Veterans Administration Hospital the use of the biopsy and photographic capabilities of the instrument was not as extensive as elsewhere, the medical testimony of the plaintiff supports the finding that in all instances in which the fiberscope is used for diagnostic purposes by that witness, the biopsy, cytology, suction and photographic capabilities of the instrument in question, are utilized from 80% to 100% of the time it is in operation.

It was further pointed out in the medical testimony presented that whereas the single function of an instrument such as an endoscope permits only a direct observation of the stomach and gastrointestinal areas, the added functions and capabilities of the fiberscope have caused an advancement in medical techniques which previously had been unknown and unavailable and which ultimately will permit further advanced techniques—not only diagnostic but also therapeutic in character.

There can be no dispute that vision is required in the use and operation of the fiberscope. There, likewise, can be no dispute that light provided by an electrical power unit and transmitted through bundles of fibers is required to permit a visual observation as well as the other uses to which the instrument may be applied. The defendant, accordingly, predicates its argument on the premise that without light produced through the bundle of fibers and without the lens and channel through which vision is obtained, the capability to perform a biopsy, cytology, to secure stomach and gastrointestinal secretions through suction and to secure a "documentation" of the stomach area by means of photography would be precluded.

In many of the prior decisions relating to optical instruments, language has been used therein which, although appropriately descriptive and in proper context in the individual case in which it was used, may be inappropriate and misleading when applied to articles involving other and additional characteristics and functions such as found in the case at bar. This court as well as the Court of Customs and Patent Appeals frequently has adopted such definitive terms as "primary," "principal" or "dominant" functions as distinguished from "ancillary," "incidental" or "minor" functions. *Engis Equipment Company v. United States*, 294 F.Supp. 964, 62 Cust.Ct. 29, C.D. 3670 (1969); *Parsons Optical Laboratories, Harper, Robinson & Co. v. United States*, 68 Cust.Ct. 143, C.D. 4351 (1972); *United States v. American Machine & Metals, Inc.*, 29 CCPA 137, C.A.D. 183 (1941); *Chas. Kurz Co. v. United States*, 57 Cust.Ct. 90, C.D. 2735 (1966). It should not be interpreted that any criticism herein is being directed to these specific decisions or to the use of the language contained in each respective opinion. Suffice it to say, that in the case at bar, this court deems the use of the aforementioned definitive terms as the test for classification purposes to be inappropriate in that they do not truly articulate and reflect the legal justification upon which the determination of the instant action should be made. In attempting to determine which function or capability of the instrument in question is "primary" as distinguished from "ancillary" in view of the testimony presented with respect to its use, indeed, may easily lead one into a never-ending circle.

The Court of Customs and Patent Appeals, speaking through Judge Rich, in the case of *United States v. Oxford International Corp.*, 517 F.2d 1374, 62 CCPA ——, C.A.D. 1154 (1975), has provided a helpful clarification and a meaningful direction with respect to the classification of articles which may possess multiple functions and

uses. In reviewing and distinguishing those cases previously decided by that court in which the "more than" doctrine was determined to be applicable, the court summarized its conclusion by stating:

"Similarly with the other cases cited by appellee, in each there was a second significant function in the importation justifying the application of the 'more than' doctrine." 517 F.2d at 1377, 62 CCPA at ——.

Again, in referring to the application of this doctrine in the case of *United States v. Acec Electric Corp.*, 474 F.2d 1009, 60 CCPA 113, C.A.D. 1091 (1973), the court stated:

"The clutching function was an addition to the function of the motor in supplying power." 517 F.2d at 1377, 62 CCPA at ——. (See other cases cited therein.)

It would serve no useful purpose to review at length once again the many cases referred to by the Court of Customs and Patent Appeals in its encompassing analysis of the meaning and application of the "more than" doctrine in the *Oxford International, Corp.* decision. This court, applying the test and standard enunciated by our appellate court, thus is confronted with the single question which is deemed to be basically determinative of the issue herein—does the article possess "a second significant function * * * justifying the application of the 'more than' doctrine."

From all of the testimony adduced, it, indeed, appears that the instrument in question not only has an optical function but also has additional "significant" functions, included among which are the capabilities of performing biopsies, cytologies and photography for documentation purposes. Vision as well as light is of extreme importance and is in most instances a necessity in whatever the human eye and hand may endeavor to perform. Notwithstanding the indispensable character of the functions of this instrument which provides light and visual observation, the additional capabilities and functions thereof are of such "significance" as to require the instrument in question to be held "more than" a medical-optical instrument and appliance.

Having determined that the plaintiff has met its burden of proof that the merchandise in question was not properly classified under item 709.05, TSUS, our consideration is directed to the fact as to whether the instrument in question may be properly classified as an electro-medical apparatus, and parts thereof, under item 709.17, TSUS, as claimed by the plaintiff.

The defendant has devoted a considerable portion of its brief to the contention that the instrument in question was not intended to be included within the purview of item 709.17, TSUS, by virtue of the fact that the superior heading to items 709.05 and 709.17, TSUS, is derived from the heading in section 90.17 of the *Brussels Nomenclature*, 1955. Because of the similarity of language, the defendant further contends that the interpretation of the language in the *Brussels Nomenclature* may be taken as evidence of the meaning intended by the Tariff Commission.

It is the opinion of this court, however, that the pleadings in the within action cause any continued consideration or discussion of the foregoing argument to be unnecessary. Paragraph "Eleventh" of plaintiff's complaint alleges:

"Eleventh: That if the Court finds that the subject merchandise does not consist of optical instruments or apparatus, or parts thereof, said merchandise is properly provided for within the provisions of Item 709.17, *supra*, as claimed by the plaintiff herein;"

In its answer to plaintiff's complaint, the defendant has admitted plaintiff's foregoing allegation. In view of defendant's admission in the pleadings herein, the plaintiff's burden of proof with respect to its claimed classification has been fully satisfied and is no longer in issue.

Accordingly, the court finds that the merchandise in question properly should be classified as an electro-medical apparatus, and parts thereof, under item 709.17, TSUS, as modified by T.D. 68–9, as claimed by the plaintiff herein.

Let judgment be entered accordingly.