(C.D. 4668)

NORMAN G. JENSEN, INC. *v.* UNITED STATES

Court No. 71–12–02025

Port of Minneapolis–St. Paul

(Decided August 12, 1976)

*Barnes, Richardson & Colburn* (*Peter J. Fitch* of counsel) for the plaintiff.
*Rex E. Lee,* Assistant Attorney General (*Max F. Schutzman,* trial attorney), for the defendant.

MALETZ, Judge: This case involves the proper tariff classification of gunsights that were manufactured in and exported from Great Britain and entered at Minneapolis-St. Paul, Minnesota on August 13, 1970 and September 22, 1970. Plaintiff Jensen was the customs broker and the consignee was Normark Corporation of Minneapolis.

The gunsights in question were classified by the government under item 708.89 of the Tariff Schedules of the United States, as modified by T.D. 68–9, as other optical appliances and instruments and assessed duty at the rate of 31 percent ad valorem.

Plaintiff claims (1) that the gunsights designated as F/A 010 on the invoices should properly have been classified as other parts of rifles under item 730.67 of the tariff schedules, as modified by T.D. 68–9, dutiable at the rate of 12.5 percent ad valorem and (2) that the gunsights designated as F/A 012 should properly have been classified under item 730.75, as modified by T.D. 68–9, as other parts of shotguns, dutiable at the rate of 8 percent ad valorem.

The pertinent provisions of the tariff schedules read as follows:

Classified under:

Schedule 7, part 2, headnote 3:

3. The term "optical instruments", as used in this part, embraces only instruments which incorporate one or more optical

elements, but does not include any instrument in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose.

*     *     *     *     *     *     *

> Optical appliances and instruments not provided for elsewhere in part 2 of this schedule; frames and mountings for such articles, and parts of such frames and mountings:
>
>     *    *    *    *    *    *    *

708.89         Other appliances and instruments ___     31% ad val.

Claimed under:

> Pistols, revolvers, rifles, shotguns, and combination shotguns and rifles, all the foregoing which are firearms designed to fire shot, pellets, or bullets * * *:
>
>     *    *    *    *    *    *    *
>
> Rifles:
>
>     *    *    *    *    *    *    *
>
> Shotguns:
>
>     *    *    *    *    *    *    *
>
> Parts of the foregoing firearms * * *:
>
>     *    *    *    *    *    *    *
>
> Rifle parts:
>
>     *    *    *    *    *    *    *

730.67         Other _____     12.5% ad val.

> Shotgun parts:
>
>     *    *    *    *    *    *    *

730.75         Other _____     8% ad val.

Against this background, the major question in controversy is whether the imported gunsights are optical appliances or instruments.

I

. The gunsights in issue are tubular in shape and about 6½ inches in length. Each sight basically consists of two assemblies: An outer steel body or cover and an inner collimator. [1] The collimator consists of a tapered aluminum tube at one end of which is a biconvex glass lens [2] approximately 1 inch in diameter which is held in a ring type

---

[1] A collimator is a device for producing a beam of parallel rays of light. See, e.g., *Engis Equipment Co.* v. *United States*, 62 Cust. Ct. 29, 31, 294 F. Supp. 964, 966, C.D. 3670 (1969). See also defendant's exhibit A, p. 15. This exhibit is a booklet which bears the signatures of two officials of the consignee Normark Corporation and, during the period in issue, was included by Normark in each box that contained a gunsight it sold. This booklet (hereafter referred to as the "Normark booklet") describes the "principles and how to use" the gunsights in question.

[2] A biconvex lens is one in which both of the surfaces curve outward as a result of which the lens is thicker in the middle and thinner at the edges. See R. 142.

fitting. At the forward end of the inner tube is an aperture and a light-collecting system. This light-collecting system is a red plastic piece of material, specially designed to gather and transmit all red rays and provides the aperture with intensive even red light in the form of a red dot.

The outer steel body performs primarily a protective function and is fitted with a form of mounting. At approximately the center of the outer body are two spring adjustment screws for adjusting the gunsight to the user's personal vision and the trajectory of the gun. Also attached to the outer body is an unbreakable plastic dome which protects the light-collecting system.

The sights in question are intended for a specific type of hunting, namely close-range shooting on fast-moving targets. More particularly, the F/A 010 sight is designed to be mounted on rifles and is intended for use on a fast-moving target located at a distance of 100 to 150 yards, while the F/A 012 sight is designed for shotguns and intended for use on targets about 40 yards away.

In order to use the sight, the shooter, after putting the rifle to his shoulder, keeps both eyes open and concentrates on a particular target. The right eye (assuming that the shooter is right-handed) sees the light point in the gunsight which is in the shape of a red dot and the left eye sees the target. If the left eye is closed, then the only thing visible is the black tunnel of the sight with a red dot in it. If the right eye is closed, the only thing visible is the side of the sight of the weapon and the target.

When a shooter uses the imported sight, he does not look into it but rather looks at it and at the same time that he is looking at the sight both his eyes are concentrating on the target. In order for the shooter to use the sight without being injured by the recoil of the rifle, it is necessary to have his eye approximately 3 to 5 inches away from the edge of the sight. Additionally, if the eye is placed flush against the sight, the shooter's aim would be less effective because he would lose the peripheral vision around the sight. In other words, by keeping the sight from 3 to 5 inches from his eye, the shooter sees with that eye the red dot as well as the periphery of the target area.

The principle upon which the sight works is to take advantage of the normal binocular vision of humans [3] by fusing the image of the aiming spot with the image of the target, i.e., the image of the target perceived by the nonsighting eye is fused, by operation of the cortex in one's brain, with the peripheral image of the target and aiming spot perceived by the sighting eye. Stated otherwise, one eye sees the target and the surrounding area of the target while the other eye has

---

[3] Binocular vision is vision employing both eyes at once. See *Webster's New International Dictionary* (1948). The gunsights in issue will not work if a person has only one eye.

a portion of the target blocked out by the presence of the sight. Thus, both eyes are looking at the target and the sight blocks out a part of the target on one eye and represents an image of an aiming spot. Since the other eye is viewing the target, an image is transferred to the cortex of the brain. Thus, the shooter sees the image of an aiming spot as being part of the nonoccluded image.

Various excerpts from the Normark booklet are helpful in enabling one to understand how the sights in issue are used. Thus, page 8 of the booklet states in part that—

> * * * It is extremely important that the sight be zeroed in to the individual's eyes. The reason for this is that you are not sighting with one eye, and the effects of sight alignment with two eyes can vary considerably between shooters. There is one difference from sighting a normal telescope or open-type sight, and that is not to try to hold the [red] dot on the target for any length of time. With your left eye focusing on the target (for right-handed shooters), when the [red] dot lines up, pull the trigger.

Also helpful is the following comment at page 10 of the Normark booklet:

> First practice raising the gun quickly so that the 'light point' [red dot] is immediately seen. * * * Using two eyes, FOCUS on your target, mount the gun quickly, DIRECT the 'light point' [red dot] on your target, and squeeze the trigger.

## II

As stated previously, the imported sights were classified under item 708.89 as other optical appliances and instruments. Also, as stated previously, headnote 3 of part 2, schedule 7 of the tariff schedules defines "optical instruments" as "instruments which incorporate one or more optical elements, but does not include any instrument in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose." Viewed against this statutory definition, it must be concluded that if an imported article consists of one or more optical elements the purpose of which is not subsidiary with regard to the operation of that article, then it is properly classifiable as an "optical instrument" under the tariff schedules. See *Amaco, Inc.* v. *United States,* 74 Cust. Ct. 172, 179, C.D. 4602 (1975). See also *Librascope Div. of Singer-General Precision, Inc.* v. *United States,* 76 Cust. Ct.197, C.D. 4656 (1976). Thus the two key problems before us are (1) whether the sights incorporate one or more optical instruments, and (2) whether the optical elements perform a dominant or primary purpose. For the reasons that follow, it is

**14**

held that the sights in question meet these criteria and were therefore correctly classified as optical instruments.[4]

At the outset, it is to be noted that the term "optical elements" includes lenses, prisms and mirrors. See, e.g., *Summary of Tariff Information* (1929), p. 552; *Engis Equipment Co.* v. *United States, supra,* 62 Cust. Ct. at 32. Further, the superior heading to items 708.01 through 708.29 of the tariff schedules provides for classification of "[l]enses, prisms, mirrors, and other optical elements * * *." Also, the term "optical," as used in tariff nomenclature, has been judicially construed to relate to the phenomena of both light and vision. See, e.g., *United States* v. *Bliss & Co.,* 6 Ct. Cust. Appls. 433, 440, T.D. 35980 (1915); *G.A.F. Corp. et al.* v. *United States,* 67 Cust. Ct. 167, C.D. 4269 (1971). Accordingly, an "optical element" for tariff purposes consists of lenses, prisms, mirrors, or other articles which depend for their operation on the phenomena of light and vision.

In this context, the record is clear that the sights in question incorporate two optical elements, namely, the lens and the red translucent plastic object on the forward end of the sights. That a biconvex lens is present in the articles at bar is unquestioned. In addition, it is apparent from the Normark booklet (pp. 4–6) that the lens is one of the key elements of the sight.

With regard to the red plastic translucent object on the forward end of the sights, it, too, is an optical element in that it is specially designed to gather light rays and then bend and convey those light rays through a small aperture in the direction of the lens. Thus plaintiff's witness Nils Ruder, the inventor of the imported sights and the

---

[4] The *Tariff Classification Study*, Schedule 7 (1960), p. 140, states that headnote 3, part 2, schedule 7 "includes a definition of the term 'optical instruments' * * * [which] [i]t is believed * * * substantially conforms with existing customs practice." Relying upon this headnote, the court in *Parsons Optical Laboratories et al.* v. *United States,* 68 Cust. Ct. 143, 146–47, C.D. 4351 (1972) concluded that the criteria under the Tariff Act of 1930 for determining whether an article was an "optical instrument" were applicable in ascertaining whether the article was an "optical instrument" under the tariff schedules. These criteria under the Tariff Act of 1930 were stated by the court as follows in *Engis Equipment Co.* v. *United States,* 62 Cust. Ct. 29, 32, 294 F. Supp. 964, 966–67, C.D. 3670 (1969): (1) The device must function in such manner that employment of its optical features is dominant or primary, as compared to the role of its other components; (2) The device's optical elements must be essential to its operation; that is, to be considered an optical instrument, the device cannot be operated in its intended manner without the optical components; (3) The instrument must, in performing its intended function, act upon, deal with, or route rays of light; (4) The optical system of the instrument must aid human vision or create for inspection a picture or image of some object.

In *Parsons* the court found that an applanation tonometer—which is an instrument designed to measure the intraocular pressure of the eye by means of a "doubling" prism—met the foregoing criteria and hence was properly classified by the government as an optical opthalmic instrument. Parenthetically, it may be added that an applanation tonometer is *a fortiori* an "optical instrument" under the headnote 3 definition.

The point to all this is that upon further consideration of headnote 3, and in light of the decision of this court in *Amaco,* it is concluded that the criteria under the Tariff Act of 1930 as set out in *Engis* are not controlling in ascertaining whether or not an article is an optical instrument under the tariff schedules. Rather, it is concluded that the controlling definition under the tariff schedules is that set forth in headnote 3. Withal, as discussed below, the present record not only supports the classification of the present gunsights as "optical instruments" within the headnote 3 definition, but also supports their classification as "optical instruments" within the *Engis* criteria.

managing director of Singlepoint, Ltd., the manufacturer of the sights, testified (R. 97–98):

> Q. Mr. Ruder, what function does the red plastic in the sight * * * have?
> A. It only colors the aiming dot.
> Q. It colors—?
> A. It colors the light, the aiming dot.
> Q. *Does it, in fact, play a light-gathering function?*
> A. *Partly, yes.* [Emphasis added.]

With further reference to this red plastic object, defendant's witness, Richard Mastrom, a senior optical engineer employed by Honeywell, Inc. in the development of optical systems engineering, testified (R. 167):

> Q. Now, I direct your attention to the piece of red plastic, the red plug at the end of Plaintiff's Exhibit 1 [one of the sights in question]. And, do you have an opinion, Mr. Mastrom, with regard to whether or not that red plastic object performs any function with respect to this article?
> A. Yes, I believe it performs two functions.
> Q. Could you please elaborate?
> A. One, it's acting like an optical filter that is absorbing all of the light transmitted through it except for the rays in the area of the red portion of the visible spectrum and it is so shaped so as to direct light from the bright areas of the sky to the aperture in the sight itself.
> Q. Consequently, would you therefore state that the red plastic object performs an optical function with respect to the * * * sight?
> A. Yes, I would.

Further, page 6 of the Normark booklet states in part:

> The * * * sight consists of two assemblies: The collimator and the outer body. The collimator consists of a tapered tube, at one end of which is a lens, and at the other end an aperture and *light-collecting system.* * * * The light-collecting system is an acrylic, *specially designed to gather and transmit* all red rays which provides the aperture with intensive even red light. [Emphasis added.]

In a similar vein, page 14 of the Normark booklet characterizes the red translucent plastic object as a "high intensity light-gathering device."

On a related aspect, the court notes that plaintiff's witness Ruder testified that the red translucent plastic object is not a prism (R. 83–84, 217). However, it must be concluded that the object functions in a manner similar to a prism since (as testified to by defendant's witness Mastrom) it operates to refract light obtained from the bright

portions of the sky. In this connection, *Webster's Third New International Dictionary* (1963) defines the term "prism" as follows:

> 2a: a transparent body bounded in part by two plane faces that are not parallel used to deviate or disperse a beam of light * * * c: something that refracts light or produces an effect suggestive of a spectrum;

As previously observed, the evidence shows that the red plastic object gathers and transmits rays of light toward the lens. Also, visual inspection of the object indicates that it is "bounded in part by two plane faces that are not parallel."

In view of the foregoing, it is evident that the imported sights incorporate two optical elements—the lens and the red translucent plastic object. Whether the latter be termed a prism or not, it is nevertheless an optical element, inasmuch as it is directly related to the phenomena of light and vision, i.e., it gathers and transmits light rays for visual inspection.[5]

We next consider whether the dominant or primary use of the sights in issue lies in the employment of their optical elements. One of the crucial questions in this respect is the purpose of the lens. As to this, plaintiff's witness Ruder, the inventor of the sights in question, stated that the purpose of the lens is to place the image of the red aiming spot in a comfortable focal plane to one's eye (R. 77), and that it operates to enable the eye, which is focusing on a distant object, to accommodate to the aiming spot through elimination of the fuzziness of that spot, in somewhat the same fashion as a pair of eyeglasses would eliminate the fuzziness of reading material, although the subject lens places the image of the aiming spot at infinity, while eyeglass lenses do not (R. 103–5). In regard to the magnification of the lens, Mr. Ruder, after testifying on direct examination that the lens did not magnify the image of the red aiming spot (R. 72, 78), testified on rebuttal (after having heard defendant's witness Mastrom testify to the contrary), that the lens present in the imported sights *does* provide a degree of magnification, i.e., it magnifies an object (the red aiming spot) for inspection (R. 213–14). Attempting to explain his previous testimony to the contrary, Mr. Ruder stated that it is *only* when the eye is placed in the same position as the lens in the imported sights that the lens does not magnify (R. 211, 214), but that when the eye is placed at any distance away from the lens, the image of the red aiming spot *will* be magnified (R. 216).[6] Additionally, Mr. Ruder stated that the lens operates to render parallel the light rays absorbed by the sight (R. 100).

---

[5] Even if the red translucent plastic object is not an optical element, inasmuch as the statutory definition for an "optical instrument" requires only that it incorporate *one* or more optical elements, the presence of the lens alone in the imported sights is enough fully to satisfy this initial requirement.

[6] The record, as previously pointed out, makes clear that the shooter's eye should be about 3 to 5 inches away from the edge of the sight.

Defendant's witness Mastrom stated that the lens performs two essential functions with respect to the imported sight: (1) it provides an image of the red dot at a comfortable viewing distance, i.e., it "collimates the red object for the user's eye" (R. 157), and (2) in this collimating capacity, it orients the line of sight (*ibid.*), that is, it provides a distinct line of sight direction for the red dot (R. 158). This is corroborated by the testimony of defendant's witness Ackerman (R. 196, 201), who had designed a sight similar in principle to the imported sight.[7]

Further, the Normark booklet states at page 3 that the lens incorporated in the sight "magnifies and intensifies a light source," and at page 4 that "[t]he lens eliminates chromatic and spherical aberrations and produces a magnified image of the light point."[8]

In sum, the lens in the imported sight serves the following purposes:

1. It presents an image of the red aiming spot at a comfortable viewing distance to one's eye, i.e., it provides a focusing capability for the eye.

2. It magnifies the image of the red aiming spot.

3. It renders the light rays absorbed by the sight parallel, i.e., it acts as a collimator.

4. It operates to orient the line of sight by providing a direct line of sight direction for the red aiming spot.

Turning now to the function of the red plastic object in the imported sight, Mr. Ruder testified that its purpose is to gather light and color the aiming spot (R. 98). This is corroborated by the Normark booklet which states at page 6 that in addition to performing a light-gathering function, the red plastic object "transmits" red light rays toward the lens. In addition, Mr. Mastrom's testimony regarding the functions of this object is consistent with the foregoing in that he stated that the red plastic object acts as an optical filter absorbing all light transmitted through it except for those rays in the area of the red portion of the visible spectrum and that the object is shaped so as to gather light from the brightest portions of the sky (R. 167).

With the foregoing considerations in mind, we now proceed to determine whether the functions of the lens and red plastic object, as heretofore discussed, are merely incidental or "subsidiary," as they relate to the operation of the imported sight (as plaintiff contends),

[7] The testimony of plaintiff's witness Johnston that the lens is an unnecessary element in the sights at bar (R. 132); that a piece of plain glass could be used as efficiently (R. 133); and that, in his opinion, the only reason for utilization of a lens in the merchandise herein is for the purpose of keeping dust out (R. 133) cannot be given any weight. Not only is this testimony contrary to all the credible evidence in the record, it is totally inconsistent with the prior testimony of the inventor of the sight, Mr. Ruder, that a piece of plain glass *could not* be used because it would result in an optical accommodation problem (R. 77-79).

[8] "Chromatic aberration" is defined in *Webster's Third New International Dictionary* (1963) as an "aberration caused by the different refrangibilities of the colored rays of the spectrum." "Spherical aberration" is defined in the same source as an "aberration caused by the spherical form of a lens or mirror that gives different foci for central and marginal rays."

or whether the dominant or primary use of the imported sight lies in the employment of those two optical features (as defendant contends).

Relevant on this score is the manner in which the imported sight is used. This is described in the Normark booklet as follows (p. 2):

> * * * [The imported] Sights are meant to be used as a game sight where quick, fast sighting is necessary, such as in brush or heavily wooded areas. To use it effectively, you simply shoot with both eyes open. It is an optical sighting device, and when positioned on the gun similar to a telescopic sight, you simply raise your gun and sight with both eyes open. With your left eye concentrating on the target and your right eye looking at the sighting device, you will see a red dot at infinity on the target. When the red dot is on the target, pull the trigger.

This use of the sights in issue would indeed be frustrated if its optical elements, namely the lens and red plastic object, were not present therein. As stated by defendant's witness Mastrom (R. 158–59), if the lens were removed from the sights at issue, the aiming spot would no longer appear to the user at infinity, so that not only would that spot appear out of focus, but there would exist an accommodation problem as well. That is, in the process of normal binocular vision, both eyes must focus on the same point (R. 67). The lens present in the imported sight creates an image of the red aiming spot for the sighting eye at the same point at which the non-sighting eye is viewing the target, i.e., at infinity, so that both eyes are focusing at the same point. Without the lens, either the target or the aiming spot would be continually out of focus, depending upon which of those objects the user's eyes were concentrating on; one's eyes cannot simultaneously accommodate to both a distant object (target) and one that is near (red aiming spot). Hence, the lens operates to accommodate for the different viewing distances.

Secondly, without the lens the sights in question would provide no line of sight orientation relative to the target. More particularly, the red aiming spot is aligned in such a way that it is directly keyed in, by operation of the lens, to the point of impact. Thus, page 2 of the Normark booklet observes that "in the case of the shotgun, the dot is sighted in to coincide with the pattern of the gun, in the case of the rifle, the dot is directed to where the impact of the bullet strikes." As defendant's witness Ackerman testified, if the imported sight is used without the lens, the dot can be superimposed *anywhere* merely by moving one's head (R. 201), thus eliminating that predetermined point of sight direction which is the *sine qua non* of the sights at issue. This, of course, would not occur when the lens is in place in the sight.

Furthermore, the fact that the red aiming spot would be substantially reduced in size were the lens to be removed from the subject

sights would undoubtedly render the sights more difficult to use.

Turning to the primary function of the red plastic object with regard to the operation of the imported sights, its purposes, as discussed before, are to gather light, filter out all light rays except for those in the red portion of the visible spectrum, and transmit those red rays, in the form of a red aiming spot, toward the lens. Obviously, the fact that a *red* dot was chosen by the inventor, was to provide the user with an easily recognizable aiming point which contrasts with sky and foliage (R. 102). If, however, that red plastic object were to be removed from the sights, the sights would no longer be capable of gathering light rays from the brighter portions of the sky and the only light rays which would be absorbed by the sights would be those entering on a course directly parallel to the aperture in the sight, from whatever direction the weapon was being aimed. Hence the user would perceive a considerably less illuminated image of the aiming spot, thus rendering it more difficult to sight quickly upon the target. Also without the red plastic object, there would no longer be an aiming spot in direct color contrast to the sky and foliage. Instead, the image of the aiming spot would assume the color of whatever light happened to come through from the point of sight direction (R. 103).

It is thus clear that the absence of both the lens and red plastic object from the imported sight, or the absence of either component for that matter, would completely frustrate its basic function as a gunsight.

In these circumstances, the statutory criteria for classification of the imported sight as an "optical instrument" have been fully met. And in this connection it is interesting to note that the testimony of defendant's witnesses Mastrom and Ackerman that the imported sights are "optical instruments" (R. 157, 196), comports with the categorization which Normark, the ultimate consignee herein, has itself given to its own product. Thus the Normark booklet states at page 11 that the sight in question "is an *optic sighting device* that looks like the normal telescopic sight. It is a telescope under the definition that a telescope is an optic instrument that magnifies a point of light." (Emphasis added.)

### III

Finally, even if the criteria set out in *Engis* were deemed to be applicable here (see note 4, *supra*), the sights would still be classifiable as "optical instruments." Thus, it has already been demonstrated that the sight functions in such manner that employment of its optical features, i.e., the lens and red plastic object, is dominant or primary; that those optical elements are essential to the operation of the sight; and that in performing its intended function, the sight acts

upon, deals with, or routes rays of light. The final requirement, as specified in *Engis*, is that the optical system aid human vision or create for inspection a picture or image of some object. In the court's view, the sights at bar fulfill both of these criteria.

Concededly, the sights at bar do not operate to improve the user's vision, *per se*, i.e., they do not help him to see the target better. However, the requirement is not that the instrument necessarily *improve* human vision, but *aid* human vision. In this connection, reference is made to *Webster's Third New International Dictionary* (1963), wherein the term "[gun]sight" is defined as follows (p. 2114):

11a (1): a device for guiding the eye in aiming a firearm * * *.

Inasmuch as the function of any gunsight is, therefore, to "guide the eye" of the user to the desired point of impact, it follows that all gunsights operate to aid human vision. That is precisely why they are utilized. Plaintiff agrees with this since it states at page 26 of its brief that "[i]ron, or open, sights are the type of gunsights normally sold with firearms, consisting of a notch and bead. *It could be said that such sights aid vision, but they would hardly be considered as optical.*" (Emphasis added.) Open or iron sights could "hardly be considered as optical" because, although they do in fact aid vision, they do not incorporate one or more optical elements. But this is not the case with the sights in question which, as has been shown, do incorporate one or more optical elements. Further, the sights could even be said to *improve* vision, inasmuch as the lens incorporated therein effects a magnification of the aiming spot, thus facilitating the visual perception thereof.

Further, the record is clear that the sights create for inspection an image, i.e., an image of the red aiming spot. With regard to plaintiff's assertion that "[t]he sight does not create an image in an active sense" (plaintiff's brief, p. 27), there exists testimony in the record to the contrary. Thus, defendant's witness Mastrom stated, on cross-examination, that the sights in issue, by virtue of the lens incorporated therein, create *an image* of the red aiming spot at infinity (R. 174, 177), and that he would consider that image to be an active rather than passive object (R. 173). Also, plaintiff's witness Ruder agreed that the aiming spot is a result of the interplay of the components of the imported sights (R. 98).

In short, not only do the imported guns fall within the headnote 3 definition of "optical instruments," they satisfy the *Engis* criteria for classification of imported articles as "optical instruments."

## IV

As indicated before, plaintiff claims that the F/A 010 gunsights should have been properly classifiable under item 730.67 as other

parts of rifles and that the F/A 012 sights should have been properly classifiable under item 730.75 as other parts of shotguns. Relevant to these claims is General Interpretative Rule 10(ij) of the tariff schedules which provides that "a provision for 'parts' of an article covers a product solely or chiefly used as a part of such article, *but does not prevail over a specific provision for such part.*" (Emphasis added.) As stated by this court in *American Laubscher Corp. et al.* v. *United States*, 64 Cust. Ct. 384, 388, C.D. 4006 (1970), the phrase "specific provision for such part" in rule 10(ij) has been construed as applicable to tariff provisions which describe an article by either name or specific function. See also, e.g., *J. E. Bernard & Co., Inc.* v. *United States*, 59 Cust. Ct. 31, 36, C.D. 3060 (1967). Also, in *Robert Bosch Corp. et al.* v. *United States*, 63 Cust. Ct. 187, C.D. 3895 (1969), the court stated (p. 193):

> We gather that the words "a specific provision for such part" in the context of Rule 10(ij) are satisfied if a generic term for an article has been listed in the schedules, and must conclude that the language of 685.22 [other radiotelegraphic and radiotelephonic transmission and reception apparatus] is a sufficiently specific designation for automobile radios and antennas to prevent their classification as parts of automobiles.

Against this background, the provision under which the imported merchandise was classified, namely, item 708.89—covering other optical appliances and instruments—is clearly "specific" in providing for the articles at bar by both name and specific function. The imported sights have been shown to be "optical instruments" and were classified as "optical instruments." Inasmuch as these articles are thus specifically provided for in the tariff schedules, their classification as parts of rifles, or parts of shotguns, is thus precluded by operation of General Interpretative Rule 10(ij).

For the foregoing reasons, it is concluded that the gunsights in issue were properly classified under item 708.89 as other optical appliances and instruments. Plaintiff's claims are overruled and judgment will be entered accordingly.