(C.A.D. 1184)

The United States v. Ataka America, Inc., No. 76–17 (550 F. 2d 33)

United States Court of Customs and Patent Appeals, March 10, 1977*

*Rex E. Lee*, Assistant Attorney General, *David M. Cohen*, Chief, Customs Section, *Jerry P. Wiskin*, attorneys of record, for appellant.

*Rode & Qualey*, attorneys of record, for appellee, *Ellsworth F. Qualey*, of counsel.

*Satterlee & Stephens*, attorneys of record, for Amicus Curiae, *Henry J. Formon, Jr.*, of counsel.

[Oral argument on February 2, 1977 by Jerry P. Wiskin for appellant and by Ellsworth F. Qualey for appellee]

Before MARKEY, *Chief Judge*, RICH, BALDWIN and MILLER, *Associate Judges*, and PHILIP NICHOLS, *Associate Judge*, United States Court of Claims.

MARKEY, Chief Judge.

■ This is an appeal by the Government from a judgment of the United States Customs Court, 76 Cust. Ct. 70, C.D. 4637, 411 F. Supp. 779 (1975), sustaining Ataka's protest of the classification of imported goods known as fiberscopes under item 709.05, Tariff Schedules of the United States (TSUS), as "Other" optical instruments. Ataka claimed, and the Customs Court held, classification to be proper under item 709.17, TSUS, as "Other" electro-medical apparatus. We reverse.

The involved TSUS provisions are:

> Medical, dental, surgical and veterinary instruments and apparatus (including electromedical apparatus and ophthalmic instruments), and parts thereof:

---

*Petition for Rehearing denied May 5, 1977.

Optical instruments and appliances, and
parts thereof:

\* \* \* \* \* \* \*

709.05       Other_____ 25% ad val..

\* \* \* \* \* \* \*

Other:

\* \* \* \* \* \* \*

Electro-medical apparatus, and
parts thereof:

\* \* \* \* \* \* \*

709.17       Other_____ 6% ad val.

## Description of the Goods

The imported goods were invoiced as "Olympus Upper GI Photo fiberscopes, Model GIF–D, without. CLE and FIT," that is, direct vision (–D) gastrointestinal fiberscopes without accessory light source-power supply or medical camera.

We reproduce the accurate and concise description of the goods which appears in the Customs Court opinion, with the addition of an illustrative figure taken from Ataka's catalog:

> From the exhibits and the testimony introduced, it appears that the instrument in question, commonly referred to as a fiberscope, consists of three major parts: a flexible insertion tube, a control unit, and a light guide portion. The tube portion of the instrument, designed to be inserted through the mouth and throat of the individual for the purpose of examining the esophagus, stomach and gastrointestinal areas of the body, consists of six channels: (1) a channel for suction, biopsy and cytology purposes; (2) a channel for visual observation consisting of the lens and a bundle of glass fibers; (3) and (4) channels for light illumination; (5) a channel for water, and (6) a channel for air.

Water Feeding Nozzle   Objective   Insufflation Nozzle   Light Guides   Suction & Forceps Channel

The second portion of the instrument, referred to as a control unit, possesses an angle control mechanism which directs the tip of the fiberscope and also includes a mechanism for the control of air, water and suction, a biopsy port or opening and an eyepiece lens. The third portion of the instrument, a light guide portion, can be attached to a light source and power supply—a separate instrument described as model CLE. The power supply unit, although not a part of the imported merchandise in question, is suitable only for use with the fiberscope and provides the electricity required for the production of light and the operation of the instrument. The medical camera, referred to as FIT, although not a part of the imported merchandise in question, likewise is suitable only for use with the fiberscope. The light which is produced initially in the power supply unit is transmitted through the bundle of glass fibers within the fiberscope providing the illumination necessary for visual observation as well as the utilization of the other capabilities of the instrument hereinbefore described.

From the expert medical testimony presented at the trial of the within action, all witnesses agreed that the extent of use of the additional capabilities of the instrument in question depended in large part upon the custom and practice in each individual hospital. Although the defendant's medical witness indicated that in the New York Veterans Administration Hospital the use of the biopsy and photographic capabilities of the instrument was not as extensive as elsewhere, the medical testimony of the plaintiff supports the finding that in all instances in which the fiberscope is used for diagnostic purposes by that witness, the biopsy, cytology, suction and photographic capabilities of the instrument in question, are utilized from 80% to 100% of the time it is in operation.

It was further pointed out in the medical testimony presented that whereas the single function of an instrument such as an endoscope permits only a direct observation of the stomach and gastrointestinal areas, the added functions and capabilities of the fiberscope have caused an advancement in medical techniques which previously had been unknown and unavailable and which ultimately will permit further advanced techniques—not only diagnostic but also therapeutic in character. [76 Cust. Ct. at 70, 411 F. Supp. at 780–81].

### The Customs Court

The Customs Court, relying upon our opinion in *United States* v. *Oxford International Corp.*, 62 CCPA 102, C.A.D. 1154, 517 F. 2d 1374 (1975), framed the determinative question to be: "does the article possess 'a second significant function * * * justifying the application of the "more than" doctrine.' " Noting that the subject fiberscopes, in addition to their optical function, possessed the additional functions of enabling the performance of biopsies, cytologies, and photography, the court held the fiberscopes to be "more than" medical-optical instruments.

Having determined the liquidation classification to have been improper, the court held that the Government had admitted the correctness of Ataka's claimed classification in its pleadings. Both portions of Ataka's dual burden of proof were thus found to have been satisfied.[1]

## Arguments

The Government argues that the Customs Court ignored both statutorily and judicially stated law in failing to sustain the classification of the subject fiberscopes as "Other" optical instruments. It urges that the fiberscopes fulfill the statutory definition of optical instruments in headnote 3 and the judicial definition thereof in *Engis Equipment Co.* v. *United States*, 62 Cust. Ct. 29, C.D. 3670, 294 F. Supp. 964 (1969). Moreover, the Government argues, the Customs Court failed to consider General Interpretative Rule 10(c)(ii)[2] in its application of the "more than" doctrine. The Government's position is that because Rule 10(c)(ii) requires a comparison between tariff provisions of equal status, the Customs Court should have compared the immediately preceding superior headings to items 709.05 and 709.17. Such a comparison would have resulted in comparing "Optical instruments * * *: * * * Other" with "Other * * * Electro-medical apparatus:" i.e., non-optical instruments. The Government argues that a fiberscope "cannot be both 'more than' optical, *i.e.*, containing at least one optical feature, and 'other' than optical, *i.e.*, containing no optical feature." Accordingly, the Government contends that the Customs Court failed to perceive the correct legal issue herein.

In support of the Government's position, American Cystoscope Makers, Inc., as *amicus curiae*, points out that the superior heading to items 709.05 and 709.17, TSUS, is virtually identical to Section 90.17, *Brussels Nomenclature* (1955), and that the *Explanatory Notes to the Brussels Nomenclature* distinguish between optical medical instruments and electro-medical apparatus.

Ataka argues that headnote 3 (see *infra*) specifically excludes from the definition of optical instruments those devices in which optical features perform a subsidiary function. Ataka describes the primary

---

[1] Though the Government argues strongly against the presence of any binding admission, we need not and do not reach that issue herein.

[2] The Rule provides:

10. *General Interpretative Rules.*—For the purposes of these schedules—

* * * * * * *

(c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but, in applying this rule of interpretation, the following considerations shall govern:

* * * * * * *

(ii) comparisons are to be made only between provisions of coordinate or equal status, i.e., between the primary or main superior headings of the schedules or between coordinate inferior headings which are subordinate to the same superior heading;

function of the imported fiberscopes as the taking of biopsies, cytologies and photographs and the optical function as subsidiary thereto. Because the taking of biopsies, cytologies and photographs are significant non-optical functions facilitated by the fiberscope, Ataka urges that the Customs Court was correct in applying the "more than" doctrine. Additionally, Ataka argues that Congress intended that optical instruments which depend upon electricity for their operation be classified as electro-medical apparatus under item 709.17, RSUS, relying upon a statement by the Tariff Commission (*Tariff Classification Study, Second Supplemental Report* (1962) at 5) as indicating that otoscopes, the subject of *Empire Findings Co.* v. *United States*, 44 Cust. Ct. 21, C.D. 2148 (1960), are to be classified under item 709.17, TSUS.[3]

## OPINION

Congress, in headnote 3, Schedule 7, Part 2, has defined the term "optical instruments":

*Part 2 headnotes:*

\*    \*    \*    \*    \*    \*    \*

3. The term *"optical instruments"*, as used in this part, embraces only instruments which incorporate one or more optical elements, but does not include any instrument in which the incorporated optical element or elements are solely for viewing a scale or for some other subsidiary purpose.

Respecting headnote 3, the *Tariff Classification Study*, Schedule 7 (1960) at 140 explains that:

Headnote 3 includes a definition of the term "optical instruments". This definition was not in the draft published for public hearings. It is believed that this definition substantially conforms with existing customs practice.

"Existing customs practice" was summarized by the Customs Court in *Engis*, supra.[4] Therein, the Customs Court found the following characteristics necessary to qualify a device as an "optical measuring instrument":

First, the device must function in such manner that employment of its optical features is dominant or primary, as compared to the role of its other components.

\*    \*    \*    \*    \*    \*    \*

Second, the device's optical elements must be essential to its operation; that is, to be considered an optical measuring instru-

---

[3] Ataka presented an additional argument to the effect that item 709.05, TSUS, was not intended to cover instruments which depend upon electricity for their operation. The opinion of the Customs Court makes no reference to this argument. We find it without merit.

[4] As the Customs Court stated in *Amaco, Inc.* v. *United States*, 74 Cust. Ct. 172, C.D. 4602 (1975), and *Norman G. Jensen, Inc.* v. *United States*, 77 Cust. Ct. 9, C.D. 4668 (1976), it is the statute rather than the criteria of *Engis* which governs the classification of an article as an "optical instrument." The *Engis* criteria, though neither controlling nor exhaustive, do provide an appropriate compendium of "optical instrument" characteristics. A number of the criteria set forth herein were utilized by the Customs Court in delineating the characteristics of an "optical instrument" under the TSUS in *Parson's Optical Laboratories* v. *United States*, 68 Cust. Ct. 143, C.D. 4351 (1972).

ment, the device cannot be operated in its intended manner without the optical components.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Third, optical measuring instruments must, in performing their intended function of measurement, act upon, deal with, or route rays of light. This interaction between light and such optical elements as lenses, prisms and mirrors normally manifests itself in divergence, convergence, reflection, polarization, or merely conveyance of light rays.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Finally, the optical system of the instrument must aid human vision or create for inspection a picture or image of some object. [62 Cust. Ct. at 32, 294 F. Supp. at 966–67, citations omitted].

None of the foregoing criteria is determinative in every case, but they are useful in determining the statutory meaning of "optical instrument(s)" [2] Broadly, therefore we conclude that the term "optical instrument(s)" encompasses devices which act upon or interact with light, which permit or enhance human vision through the use of one or more optical elements, and, in light of headnote 3, which utilize the optical properties of the device in something beyond a "subsidiary" capacity.[5] See *United States* v. *American Machine & Metals, Inc.,* 29 CCPA 137, C.A.D. 183 (1941).

Considering first the insertion tube, it is clear that five of its six channels, interact with light or function solely or primarily to permit or enhance human vision. One channel, the viewing channel, functions solely to provide a visual image of the viscus under examination, permitting visualization of an area otherwise impossible to view with the naked eye.[6] Two other channels function solely to introduce light without which vision would be impossible. A fourth channel operates to direct water across the objective lens of the viewing channel to maintain freedom from vision-obstructing matter. A fifth channel, the air channel, operates to insufflate the viscus during examination and to keep the wall of the organ from pressing against the lens and destroying vision.

The sixth channel, the suction channel, also aids the viewing function. In addition to providing a passageway for biopsies and cytologies, the suction channel is used for extracting fluid from the organ which would otherwise impair vision.

A control unit operates to position the distal tip of the insertion tube, allowing the viewer to observe the desired portion of the viscus under examination. The control unit also regulates water, air and suction which, as above indicated, aid the viewing function. Though

---

[5] The Customs Court indicated that drawing a distinction in this case between a dominant and some lesser function "may easily lead one into a never-ending circle." However, the statutory distinction is between "subsidiary" and not "subsidiary."

[6] This channel consists solely of optical elements, including an objective lens, a fiber optic bundle and a viewing lens functioning as a magnifier.

the suction control permits biopsy and cytology samples to be taken, the control unit, in major part, operates as an integrant to the viewing function of the device.

Similarly, the light guide portion, designed to be attached to a light source—power supply, directs the light essentially to aid the viewing function.

It remains to be determined whether, as Ataka argues, the optical features of the instrument act in a subsidiary capacity to the biopsy-cytology functions, thereby excluding the fiberscopes from classification as "optical instruments," pursuant to headnote 3.

Testimony adduced at trial established that visualization is essential in the performance of biopsies and cytologies with the imported fiberscope. Ataka's argument that, in the performance of biopsies and cytologies, the optical function is subsidiary to the biopsy-cytology operation, though supported in part by the opinion testimony of one witness, is without merit. The imported device must be considered as a whole. Whether a feature be dominant or subsidiary cannot be determined by isolating a particular employment of the device. The use frequency of the biopsy and cytology capabilities of the fiberscopes varied from physician to physician and from hospital to hospital. It was undisputed, however, that all who used the instrument, for any purpose, used it to *view* the interior of a body organ. Depending upon the situation, that visual operation may be all that is performed. It is only after visual examination that a decision to take a biopsy or cytology specimen can be made.

To term optical features merely subsidiary to biopsy-cytology features, when the latter *require* the former, and when the latter are not always used and the former are always used, would be contrary to reason. Accordingly, we hold the imported fiberscopes meet the definition of "optical instruments" in headnote 3. Ataka, however, urges that the imported fiberscopes are "more than" optical instruments.

■ In resolving questions of classification, the primary inquiry is focused on the competing tariff provisions. General Interpretative Rule 10(c)(ii) requires a comparison between tariff provisions of coordinate or equal status. The main superior provision, "Medical * * * instruments and apparatus," is modified by two co-equal provisions: "Optical instruments * * *" and "Other". The first comparable provision, "Optical instruments" culminates in an all-inclusive provision "Optical instruments * * *: * * * Other". Consequently, the structure of the statute reveals that the provision "Optical instruments * * *: * * * Other" is exhaustive; that is, it embraces all other *optical* medical instruments and apparatus not specifically provided for. The second comparable provision, "Other" embraces *non-optical* medical instruments and apparatus.

Thus, the question is not whether the imported fiberscopes are "more than" optical instruments but, rather, whether the imported fiberscopes are "Other" than optical instruments. See also *Friedman v. United States*, 50 CCPA 53, C.A.D. 819 (1963), and *Nevco Furniture Corp. v. United States*, 76 Cust. Ct. 75, C.D. 4638 (1976).

The resolution of that issue is clear from its mere statement. As pointed out supra, the subject fiberscopes fulfill the Congressional definition of "optical instruments" contained in headnote 3. The subject fiberscopes cannot be both "Optical instruments," as defined by Congress, and something "Other" than "Optical instruments." We conclude, therefore, that the subject fiberscopes were properly classified under item 709.05, TSUS, as "Optical instruments * * *: * * * Other."

Appellee having failed to sustain its burden of overcoming the presumption of correctness of the original classification, its arguments in support of the claimed classification need not be discussed.

The judgment of the Customs Court is *reversed*.

BALDWIN, Judge, dissents.

(C.A.D 1185)

ANDREW AKINS v. THE UNITED STATES, No. 76-12 (551 F. 2d 1222)